## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

REPRODUCTIVE HEALTH SERVICES OF PLANNED
PARENTHOOD OF THE ST. LOUIS REGION, INC., on
behalf of itself, its physicians, its staff, and its patients; and
COLLEEN P. MCNICHOLAS, D.O., M.S.C.I.,
F.A.C.O.G., on behalf of herself and her patients,

                                        Plaintiffs,

                            v.

MICHAEL L. PARSON, in his official capacity as
Governor of the State of Missouri; ERIC S. SCHMITT, in
his official capacity as Attorney General of the State of
Missouri; KIMBERLY M. GARDNER, in her official
capacity as the Circuit Attorney for the City of St. Louis;
JADE D. JAMES, M.D., in her official capacity as
President of the Missouri State Board of Registration for
the Healing Arts; SARAH MARTIN, PH.D., M.P.P.,
M.P.H., in her official capacity as Secretary of the
Missouri State Board of Registration for the Healing Arts;
SAMMY L. ALEXANDER, M.D., JAMES A. DIRENNA,
D.O., JEFFREY S. GLASER, M.D., F.A.C.S.,
KATHERINE J. MATHEWS, M.D., NAVEED
RAZZAQUE, M.D., DAVID E. TANNEHILL, D.O., and
MARC K. TAORMINA, M.D., F.A.C.P., in their official
capacities as Members of the Missouri State Board of
Registration for the Healing Arts; and RANDALL
WILLIAMS, M.D., in his official capacity as Director of
the Department of Health & Senior Services of the State of
Missouri,

                                        Defendants.

CIVIL ACTION

Case No. ___2:19-cv-4155___

**COMPLAINT FOR
INJUNCTIVE AND
DECLARATORY RELIEF**

Plaintiffs Reproductive Health Services of Planned Parenthood of the St. Louis Region, Inc. ("RHS"), on behalf of itself, its physicians, its staff, and its patients, and Dr. Colleen P. McNicholas, D.O., M.S.C.I., F.A.C.O.G., on behalf of herself and her patients, by and through their attorneys, bring this Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof state the following:

## INTRODUCTION

1.      For years, Missouri officials have engaged in a targeted campaign against abortion.  Through the enactment of medically unnecessary restrictions and requirements, Missouri has succeeded in forcing two safe and high-quality health centers to stop providing abortion care and has prevented others from starting.  In addition, by requiring invasive and medically inappropriate pelvic exams before all abortions, Missouri also put Plaintiffs in the position of having to stop providing medication abortions except in those rare cases where a pelvic exam is clinically appropriate.  As a result, by early 2019, the entire state of Missouri was left with only one abortion clinic, located on the easternmost edge of the state, that provides only one of the two main types of abortion care on a regular basis (that is, surgical, but not medication, abortion).  Starting in May 2019, the Missouri Department of Health & Senior Services ("DHSS") undertook efforts to shutter this last remaining clinic—efforts that have thus far been blocked by stay orders from a Missouri State Court and the Missouri Administrative Hearing Commission.  Yet even this was not enough.

2.      On May 25, 2019, Missouri officials launched their most extreme attack on the rights guaranteed under *Roe* v. *Wade* when Governor Parson signed House Bill No. 126—the subject of this Complaint—into law.

3.     Plaintiffs challenge five recently enacted abortion restrictions in that legislation (together, "H.B. 126" or "the Bans"), which, on their face, directly violate long-standing Supreme Court precedent and are the latest in Missouri's unrelenting campaign to deny patients the health care they seek and to which they are entitled.

4.     Plaintiffs seek declaratory and injunctive relief from these five Bans on behalf of themselves, their patients, and Plaintiff RHS's physicians and staff, under the United States Constitution and 42 U.S.C. § 1983.  Without this relief, the Bans will have a devastating effect on patients seeking access to abortion in the state.

5.     The Bans are:

> (a)     Mo. Rev. Stat. § 188.056 (the "8-Week Ban"), attached as Exhibit 1;
>
> (b)     Mo. Rev. Stat. § 188.057 (the "14-Week Ban"), attached as Exhibit 2;
>
> (c)     Mo. Rev. Stat. § 188.058 (the "18-Week Ban"), attached as Exhibit 3;
>
> (d)     Mo. Rev. Stat. § 188.375 (the "20-Week Ban"), attached as Exhibit 4;
>
> (e)     Mo. Rev. Stat. § 188.038 (the "Reason Ban"), attached as Exhibit 5.

6.     All Bans are set to take effect on August 28, 2019.

7.     For more than four decades, the Supreme Court has held that "a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability."  *Planned Parenthood of Se. Pa.* v. *Casey*, 505 U.S. 833, 879 (1992); *see id.* at 871

2

("The woman's right to terminate her pregnancy before viability is the most central principle of *Roe* v. *Wade*. It is a rule of law and a component of liberty we cannot renounce."). Because the decision to bear a child is one of the "most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, [and] central to the liberty protected by the Fourteenth Amendment," the Supreme Court has clearly held that, before viability, a State cannot "insist [a patient] make the sacrifice" to undergo the "anxieties, [the] physical constraints, [and] pain that only she must bear" in pregnancy and childbirth. *Id.* at 852.

8.      Prior to the enactment of H.B. 126, Missouri already regulated the timing of abortion to the extent permitted under binding Supreme Court precedent. Specifically, section 188.030(1)—a provision Plaintiffs do not challenge and which remains in effect in parallel to the new Bans—prohibits "abortion of a viable" fetus except in the case of a medical emergency. Under that Missouri statute, viability is defined, consistent with binding Supreme Court precedent, as "that stage of fetal development when the life of the [fetus] may be continued indefinitely outside the womb by natural or artificial life-supportive systems," without reference to a specific week in pregnancy. Mo. Rev. Stat. § 188.015(10) (effective Aug. 28, 2011). *See, e.g.*, *Colautti* v. *Franklin*, 439 U.S. 379, 388 (1979) ("Viability is reached when, in the judgment of the attending physician on the particular facts of the case before him [or her], there is a reasonable likelihood of the fetus' sustained survival outside the womb, with or without artificial support.").

9.      H.B. 126, however, directly conflicts with more than four decades of binding precedent by criminalizing the provision of pre-viability abortions and, indeed, would prohibit the vast majority of pre-viability abortions performed in Missouri. Specifically, four of the Bans (the "Gestational Age Bans") make it a crime to perform an abortion at or after 8, 14, 18, and 20

3

weeks of pregnancy, respectively, as measured from the first day of a patient's last menstrual period ("LMP"),[1] despite the fact that viability does not occur until well after the latest of these gestational limits. And the Reason Ban proscribes the provision of pre-viability abortion at *any* stage of pregnancy, if the provider "knows" that the patient's decision to terminate her pregnancy is based on (1) a "prenatal diagnosis, test, or screening" indicating Down syndrome or the potential for it, or (2) the sex or race of the embryo or fetus. The Bans therefore outright forbid patients from exercising their constitutionally protected right to a pre-viability abortion in Missouri, in violation of the Fourteenth Amendment to the United States Constitution.

10. Unless this Court grants Plaintiffs the relief they seek, the Bans will irreparably harm Plaintiffs and their patients by severely restricting access to pre-viability abortion care, preventing the vast majority of patients from obtaining the constitutionally protected medical care they seek. As a result, some patients will be prevented from obtaining abortion care entirely, and be forced to carry their pregnancies to term against their will—for some, even in the face of significant health risks that nevertheless would not qualify as a "medical emergency" under the Bans. Other patients will attempt to seek abortions outside the medical system (with the risks that may entail); and others may be forced to attempt to obtain care in other states (and incur all the associated economic and logistical burdens and health risks of delay). Because each of the Bans plainly prohibits a patient from making the ultimate decision to terminate her pregnancy before viability, each is *per se* unconstitutional. Missouri's expressed interest in protecting potential life cannot alter the unconstitutionality of the proposed Bans; before

---

[1]     In the medical context, pregnancy is measured from the first day of a patient's LMP.

viability, "the means chosen by the State to further [its] interest in potential life must be calculated to inform the woman's free choice, not hinder it." *Casey*, 505 U.S. at 877.

11. In accordance with established precedent and to protect their patients and themselves from these constitutional violations and to avoid irreparable harm, Plaintiffs seek declaratory and injunctive relief to prevent enforcement of these five Bans.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a)(3).

13. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

14. Venue is appropriate under 28 U.S.C § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiffs' claims will occur in this judicial district and the majority of the Defendants, who are sued in their official capacity, carry out their official duties at offices located in this district.

## PLAINTIFFS

15. Plaintiff RHS is a not-for-profit corporation organized under the laws of Missouri that provides high-quality reproductive health care in Missouri and is affiliated with Planned Parenthood of the St. Louis Region and Southwest Missouri ("PPSLR"). RHS operates a health center in St. Louis, Missouri, that provides abortion, contraception, adoption referral, and miscarriage management services to patients. RHS offers pre-viability surgical abortion up to 21 weeks 6 days LMP. RHS brings this action on behalf of itself, its patients, and the physicians and staff whom it employs to provide services to its patients.

5

16.     Plaintiff Colleen P. McNicholas, D.O., M.S.C.I., F.A.C.O.G. is a board-certified obstetrician-gynecologist ("OB/GYN") licensed to practice medicine in Missouri and four other states.  Dr. McNicholas is the Chief Medical Officer of PPSLR.  Dr. McNicholas has provided abortion care in a clinical setting since 2011, including at RHS and at a local hospital, and currently oversees all abortion care at RHS.  She was previously an Associate Professor in the Department of Obstetrics and Gynecology at the Washington University in St. Louis School of Medicine and served as Director of the Ryan Residency Training Program.  Dr. McNicholas continues to provide abortion care in the hospital setting.  Dr. McNicholas joins this suit in her individual capacity and in her capacity as Chief Medical Officer of PPSLR.  Dr. McNicholas sues on her own behalf and on behalf of her patients.

## DEFENDANTS

17.     Defendant Michael L. Parson is the Governor of Missouri.  Pursuant to Article IV of the Missouri State Constitution, Governor Parson is directly responsible for ensuring that all Missouri agencies, including the Missouri State Board of Registration for the Healing Arts (the "State Board") and DHSS, comply with applicable federal and state laws.  He and his agents and successors are sued in their official capacities.

18.     Defendant Eric S. Schmitt is the Attorney General of Missouri.  He has concurrent original jurisdiction throughout the State of Missouri to commence actions for any violation of a provision of Chapter 188 of Title XII—including the recently enacted Bans— whether to prosecute alleged criminal violations of H.B. 126 or to seek injunctive relief against any abortion provider who knowingly violates the Bans so as to prevent such provider from performing or inducing further abortions in violation of the Bans.  *See* Mo. Rev. Stat.

6

§§ 188.075, .056(1), .057(1), .058(1), .375(3), (8).  He and his agents and successors are sued in their official capacities.

19.     Defendant Kimberly M. Gardner is the Circuit Attorney for the City of St. Louis, whose office is located at the Carnahan Courthouse, 1114 Market St., Room 401, St. Louis, MO 63101.  Pursuant to Mo. Const. art. V, § 27(10)(b), she has the powers, duties, and functions of the prosecuting attorney of the City of St. Louis.  As such, like all other prosecuting attorneys in Missouri, she "shall commence and prosecute all civil and criminal actions in the prosecuting attorney's county in which the county or the state is concerned."  Mo. Rev. Stat. § 56.060(1).  Defendant Gardner also shares express concurrent jurisdiction with the Missouri Attorney General to "commence actions" to prosecute alleged criminal violations of any provision of Chapter 188 of Title XII, including the recently enacted Bans.  *See id.* §§ 188.075, .056(1), .057(1), .058(1), .375(3), (8).  Defendant Gardner is therefore responsible for criminal enforcement of H.B. 126 in the City of St. Louis, where Plaintiff RHS's health center is located and where Plaintiff McNicholas also provides abortion care.  Defendant Gardner also has concurrent jurisdiction with the Missouri Attorney General to seek injunctive relief against any abortion provider who knowingly violates the Bans so as to prevent such provider from performing or inducing further abortions in violation of the Bans.  *See id.* § 188.075.  Defendant Gardner and her agents and successors are sued in their official capacities.

20.     Defendant Jade D. James, M.D. is President of the State Board.  Defendant Sarah Martin, Ph.D., M.P.P., M.P.H. is Secretary of the State Board.  Defendants Sammy L. Alexander, M.D.; James A. DiRenna, D.O.; Jeffrey S. Glaser, M.D., F.A.C.S.; Katherine J. Mathews, M.D.; Naveed Razzaque, M.D.; David E. Tannehill, D.O.; and Marc K. Taormina, M.D., F.A.C.P. are members of the State Board.  The State Board is responsible for licensing medical professionals

under Missouri law. *See id.* § 334.120. The Board and its members would therefore be responsible for imposing any licensing penalties under the Bans, *see id.* § 188.065, and for imposing licensing penalties upon a final adjudication of guilt, guilty plea, or plea of *nolo contendere* in a criminal prosecution under the laws of any State—including under the Bans—for any offense reasonably related to the regulated practice of medicine, *see id.* § 334.100(1), (2)(2). The State Board Defendants and their agents and successors in office are sued in their official capacities.

21.     Defendant Randall Williams, M.D. is the Director of DHSS, a state agency created by Mo. Rev. Stat. § 192.005. DHSS is statutorily charged with the licensing of abortion facilities, *id.* §§ 197.200–.240, and it is empowered to investigate "compliance with the provisions of chapter 188," *id.* § 197.2300(2)(2), including the Bans newly enacted under that chapter of the Missouri statutes. DHSS, under the direction of Defendant Williams, would therefore be responsible for imposing any licensing penalties on Plaintiff RHS owing to any of its physicians' purported noncompliance with the Bans. Defendant Williams and his agents and successors are sued in their official capacities.

## THE CHALLENGED GESTATIONAL AGE BANS

22.     H.B. 126 imposes a cascade of Gestational Age Bans—at 8, 14, 18, and 20 weeks LMP—such that any later Gestational Age Ban is intended to remain in effect if any other Gestational Age Ban is struck down as unconstitutional. Tacitly acknowledging the unconstitutionality of the entire effort, *each* of these pre-viability Gestational Age Bans contains a severability provision stating that, if a court concludes that any of these is "unenforceable, unconstitutional, or invalid," the balance of the statute "shall remain effective notwithstanding

8

such unenforceability, unconstitutionality, or invalidity." Mo. Rev. Stat. §§ 188.056(4), .057(4), .058(4), .375(9).

23.     Each of these Gestational Age Bans bars pre-viability abortions and therefore is unconstitutional.

24.     Each of these Gestational Age Bans criminalizes knowingly performing or inducing an abortion at or beyond 8, 14, 18, or 20 weeks LMP, respectively. *See id.* §§ 188.056(1), .057(1), .058(1), .375(3); *see also id.* § 188.015(6) (providing that gestational age is measured "from the first day of the woman's last menstrual period" for purposes of the statute).

25.     These Gestational Age Bans are each subject to only one exception, which permits abortions at or after the relevant gestational point in the event of a "medical emergency." *Id.* §§ 188.056(1)–(2), .057(1)–(2), .058(1)–(2), .375(3)–(4). A qualifying medical emergency is narrowly defined as "a condition that . . . so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert the death of the pregnant woman or for which a delay will create a serious risk of substantial and irreversible physical impairment of a major bodily function." *Id.* § 188.015(7). The medical emergency exception, however, does not prevent criminal prosecutions of providers; it simply gives the provider an affirmative defense that the provider may assert in the event of prosecution. The provider bears the burden on this affirmative defense and must show, by a preponderance of the evidence, that the medical emergency exception applies. *Id.* §§ 188.056(2), .057(2), .058(2), .375(4). No other exceptions, including where the pregnancy is the result of rape or incest, exist with respect to these Gestational Age Bans.

26.     Knowingly performing or inducing an abortion in violation of the 8-, 14-, 18-, and 20-Week Bans is a Class B felony, punishable by at least five—and up to fifteen—years in prison for the provider physician.  *See id.* §§ 188.056(1), .057(1), .058(1), .375(3), 558.011(1)(2).

27.     Each of the 8-, 14-, 18-, and 20-Week Bans also mandates the suspension or revocation of a physician's license as a civil penalty for any violation.  *See id.* §§ 188.056(1), .057(1), .058(1), .375(3) (providing that a person who performs or induces an abortion in violation of each Ban shall be "*subject to* suspension or revocation of his or her professional license by his or her professional licensing board" (emphasis added)).  Additionally, the Missouri Attorney General and any competent prosecuting attorneys—including the Circuit Attorney for the City of St. Louis, Defendant Gardner—are statutorily empowered to seek injunctive relief against any abortion provider who knowingly violates any of these Gestational Age Bans so as to prevent such provider from performing or inducing further abortions in violation of H.B. 126.  *See id.* § 188.075.  Moreover, DHSS may attempt to revoke or not renew RHS's license on the basis of a violation of the Gestational Age Bans.  *See id.* §§ 197.220, .230; Mo. Code Regs. Ann. tit. 19, § 30-30.060.

## THE CHALLENGED REASON BAN

28.     The Reason Ban forbids any person from performing or inducing an abortion if such person "knows that the woman is seeking the abortion solely because of a prenatal

diagnosis, test, or screening indicating Down Syndrome or the potential for Down Syndrome"[2] or "solely because of the sex or race" of the embryo or fetus.  Mo. Rev. Stat. § 188.038(2), (3).

29.  In addition, H.B. 126 imposes a new reporting requirement to enforce compliance with the Reason Ban.  The Abortion Report required under § 188.052, which applies to an attending physician for each abortion performed, must now include "a certification that the physician does not have any knowledge that the woman sought the abortion solely because of a prenatal diagnosis, test, or screening indicating Down Syndrome or the potential of Down Syndrome" or "because of the sex or race" of the embryo or fetus.  *Id.* § 188.052(1).

30.  Violation of the Reason Ban exposes providers to civil penalties, including the revocation of their medical licenses contemplated under Section 188.065.  *See id.* § 188.038(4). A physician who knowingly violates the Reason Ban may also be subject to a cause of action for injunctive relief, brought by either the Attorney General or any prosecuting attorney, including Defendant Gardner.  *See id.* § 188.075.  Moreover, DHSS may attempt to revoke or not renew RHS's license on the basis of a violation of the Reason Ban.  *See id.* §§ 197.220, .230; Mo. Code Regs. Ann. tit. 19, § 30-30.060.

<u>**FACTUAL ALLEGATIONS**</u>

**Abortion Practice and Safety**

31.  A full-term pregnancy is approximately 40 weeks LMP.

32.  Some individuals have fairly regular menstrual cycles, with a four-week cycle being typical; others have regular cycles of different lengths; and still others have irregular

---

2   "Down Syndrome" is defined as "a chromosomal disorder caused by an error in cell division that results in the presence of an extra whole or partial copy of chromosome 21."  Mo. Rev. Stat. § 188.015(5) (adopting the "Down Syndrome" definition under Mo. Rev. Stat. § 191.923).

cycles. In a person with regular monthly periods, fertilization typically occurs two weeks post-LMP—that is, two weeks after the first day of the last menstrual period. An individual with a highly regular, four-week cycle would be four weeks LMP at the time of the first missed period.

33. Prior to and after eight weeks LMP, many individuals do not know they are pregnant—particularly those who have irregular cycles, who have certain common medical conditions, who have been using contraceptives, who are breastfeeding, or who experience bleeding during early pregnancy that could be mistaken for a period. Under H.B. 126, these individuals would be denied the opportunity to obtain abortion care in Missouri altogether.

34. Even for individuals with highly regular, four-week cycles, eight weeks LMP is a mere four weeks after they will have missed their period. A ban on abortion at eight weeks LMP would therefore allow only four weeks, at most, for a patient with a regular menstrual cycle to learn that the patient is pregnant, decide whether to have an abortion, and seek and obtain abortion care.

35. The Supreme Court has defined viability as a reasonable likelihood of sustained survival outside the uterus, with or without artificial aid. Viability is not the same for every pregnancy. It is a determination that must be made by a trained medical professional on a case-by-case basis. *Colautti* v. *Franklin*, 439 U.S. 379, 388 (1979) ("[V]iability is reached when, in the judgment of the attending physician on the particular facts of the case before him [or her], there is a reasonable likelihood of the fetus' sustained survival outside the womb, with or without artificial support.").

36. Eight weeks LMP is a pre-viability point in pregnancy.

37. Fourteen weeks LMP is also a pre-viability point in pregnancy.

38. Similarly, eighteen weeks LMP is a pre-viability point in pregnancy.

39. Likewise, twenty weeks LMP is a pre-viability point in pregnancy.

40. Viability generally does not occur until, at the earliest, several weeks after the latest of these gestational points in the pregnancy.

41. Legal abortion is one of the safest medical procedures in the United States, and is safer than continuing a pregnancy through to childbirth. Indeed, studies have estimated that a woman's risk of death associated with childbirth nationwide is approximately 14 times higher than that associated with abortion, and every pregnancy-related complication is more common among women giving birth than among those having abortions.[3]

42. The disparity in risks is even more stark in Missouri. While the national average rate for maternal mortality was 20.7 maternal deaths per 100,000 live births in 2018, the rate was more than 50% higher in Missouri—32.6 maternal deaths per 100,000 in 2018 (and a shocking 300% higher for Black women in Missouri, whose maternal mortality rate was 65 maternal deaths per 100,000 in 2018).[4] Indeed, Missouri ranks 42nd in the nation for maternal survival[5] and, if it were its own country, its rate would be comparable to Tajikistan's, putting Missouri in

---

[3] *See* Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215, 215 (2012).

[4] *See Maternal Mortality in Missouri*, Am.'s Health Rankings United Health Found., https://www.americashealthrankings.org/explore/health-of-women-and-children/measure/maternal_mortality/state/MO (last visited July 18, 2019).

[5] *See Missouri Summary 2018*, Am.'s Health Rankings United Health Found., https://www.americashealthrankings.org/explore/health-of-women-and-children/measure/maternal_mortality/state/MO (last visited July 18, 2019).

73rd place worldwide.[6]  Despite these grim statistics, in 2018 the Missouri Legislature rejected the opportunity to set up a committee dedicated to studying the issue.[7]

43.     Abortion-related mortality is also lower than that for colonoscopies, plastic surgery, and adult tonsillectomies.[8]  Abortion is safe and effective (and complications are very rare) regardless of the method of abortion used.

44.     Less than 1% of women obtaining abortions experience a serious complication.[9] The risk of a woman experiencing a complication that requires hospitalization is even lower, approximately 0.3%.[10]

45.     Legal abortion is not only extremely safe but also common; approximately one in four women in this country will have an abortion by age 45.[11]

46.     Individuals seek abortion for a multitude of complicated and personal reasons that are closely tied to each person's values, culture and religion, health and reproductive history, family situation and support system, educational or career goals, and resources and financial stability.

---

[6]     *Country Comparison: Maternal Mortality Rate*, CIA Factbook, https://www.cia.gov/library/publications/the-world-factbook/rankorder/2223rank html (last visited July 18, 2019).

[7]     *See* Andy Marso, *Missouri Among Worst Nationally in Maternal Deaths. Reps. Say No to Study on Issue*, Kan. City Star (June 3, 2018).

[8]     Ushma Upadhyay et al., *Incidence of Emergency Department Visits and Complications After Abortion*, 125 Obstetrics & Gynecology 175, 175 (2015).

[9]     *Id.*

[10]    *Id.*

[11]    *See* News Release, Guttmacher Inst., *Abortion Is a Common Experience for U.S. Women, Despite Dramatic Declines in Rates* (Oct. 19, 2017), https://www.guttmacher.org/print/news-release/2017/abortion-common-experience-us-women-despite-dramatic-declines-rates.

47.     Some patients have abortions because they conclude that it is not the right time to become a parent given their age, desire to pursue their education or career, or because they lack the necessary financial resources or level of partner or familial support or stability.

48.     Others are already parents; indeed, a majority of women having abortions in the United States already have at least one child,[12] and among RHS's abortion patients in 2018, over 63% had one or more children.  These individuals may already be struggling to adequately provide for their existing children—both materially and emotionally—and may be concerned about their ability to do so if they add another child to their family.  That strain is all the more apparent if one considers that the vast majority—approximately 75%—of abortion patients nationwide are poor or low income.[13]  That is true at RHS as well, where the overwhelming majority of abortion patients are poor or low income; indeed, in 2018, 57% were living at or below the poverty line.

49.     Other women seek abortions because continuing with the pregnancy could pose a risk to their health, and still others who struggle with addiction do not wish to carry a pregnancy to term under those circumstances.

50.     Other women seek abortions because of a diagnosis of a fetal medical condition. Some families simply do not feel that they have the financial, medical, educational, or emotional resources to care for a child with special needs or to do so alongside providing for the children they already have.

---

[12]   *See* Guttmacher Inst., *Induced Abortions in the United States* 1 (2018), https://www.guttmacher.org/sites/default/files/factsheet/fb_induced_abortion.pdf; *see also* Jenna Jerman, Rachel K. Jones & Tsuyoshi Onda, Guttmacher Inst., *Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008*, at 6, 7 (2016), https://www.guttmacher.org/sites/default/files/report_pdf/characteristics-us-abortion-patients-2014.pdf.

[13]   Guttmacher Inst., *Induced Abortions in the United States* 1 (2018), https://www.guttmacher.org/sites/default/files/factsheet/fb_induced_abortion.pdf.

**Abortion Care in Missouri**

51.     The vast majority of women who seek abortion care in Missouri (as in the nation as a whole) do so in the first trimester of pregnancy, when the pregnancy is at or less than 14 weeks LMP.[14]  For example, in 2016 through 2018, 82% of abortions at RHS were performed in the first trimester.  For that same time period, over 71% of RHS's abortion patients obtained abortions at or after 8 weeks LMP, 14% at or after 14 weeks LMP, 5% at or after 18 weeks LMP, and 2.6% at or after 20 weeks LMP.

52.     As relevant here, there are two main methods of abortion:  medication abortion and surgical abortion.  Medication abortions, which are provided in the first trimester, typically through approximately 10 weeks LMP, involve the administration of two types of medications (pills) at least one day apart to induce an early miscarriage.  Medication abortion requires no anesthesia or sedation; the patient simply takes the pills.  Medication abortion is extremely safe.[15]  Due to Missouri's pelvic exam requirement, however, RHS does not generally provide medication abortions.

53.     Surgical abortions, which are provided in both the first and second trimesters, are performed by dilating (opening) the uterine cervix and then using gentle suction and/or instruments to empty the contents of the uterus.  Despite being characterized as "surgical," these procedures are not surgical in the usual sense:  They do not involve any incision into the patient's skin and in many cases can be performed with only local anesthesia.  Pre-viability

---

[14]     *Compare id.* at 2 (national statistics), *with* Dep't of Health & Senior Servs., *Table 12B. Recorded Abortions by Race, Age, and Type of Procedure by Weeks of Gestation: Missouri, 2017*, at 1 (2017), https://health mo.gov/data/vitalstatistics/mvs17/Table12b.pdf.

[15]     Comm. on Reproductive Health Services, Nat'l Acads. of Scis., Eng'g, & Med., *The Safety and Quality of Abortion Care in the United States* 79 (2018) (finding that "[t]he risks of medication abortion are similar in magnitude to the risks of taking commonly prescribed and over-the-counter medications such as antibiotics and NSAIDs [nonsteroidal anti-inflammatory drugs]," such as ibuprofen).

surgical abortion is available at RHS and at a local hospital where Plaintiff McNicholas

maintains admitting privileges, up to and after 20 weeks LMP. At this time, surgical abortion is

the only abortion method routinely performed by RHS.

54. Surgical abortion, like medication abortion, is extremely safe. Its mortality rates

are lower than those of colonoscopies and adult tonsillectomies, and significantly lower than

those of childbirth as well.[16] Complications are extremely rare and may be handled safely and

effectively by any clinician with adequate training in abortion care, either on an outpatient basis

or (where necessary) via a referral.

55. While patients generally try to get an abortion as early in their pregnancies as

possible, in practice, numerous obstacles can cause delay. As noted, some patients (especially

those with irregular menstrual cycles) may not realize they are pregnant for weeks or months. A

patient may then be further delayed while confirming the pregnancy, researching options,

making the decision to have an abortion, contacting a provider, and scheduling an appointment.

Patients often are also delayed in obtaining funds necessary for the procedure[17] and related

expenses (travel and childcare), as well as by difficulties in making the necessary logistical

arrangements (*e.g.*, obtaining time off from work and arranging transportation and childcare).

Patients may also experience a delay in seeking an abortion because testing for fetal medical

conditions is not available until later in the pregnancy. Still other patients seek abortions later in

the pregnancy because of the progression of maternal health issues that may not emerge, be

---

[16]  Matthew B. Barry, Cong. Research Serv. R45161, *Abortion at or over 20 Weeks' Gestation: Frequently Asked Questions* 9 (2018); *see also* Nat'l Acads. of Scis., Eng'g, & Med., *supra* note 15, at 75.

[17]  Missouri law prohibits public insurance, including Medicaid, insurance purchased on the state health exchange, and most private insurance issued in Missouri, from covering abortion services except in extremely limited circumstances. *See* Mo. Rev. Stat. § 376.805.

diagnosed, or make an abortion medically advisable until later in the pregnancy. And minor patients, unless emancipated, may experience additional delay because they must obtain written consent from a parent or a court order from a judge before they can receive abortion care. *See* Mo. Rev. Stat. §§ 188.038, .250.

56.     These delays are exacerbated by current Missouri law requiring (with extremely limited exceptions) any patient who wishes to have an abortion to visit the abortion provider at least 72 hours before the procedure will be performed. *See id.* § 188.079. During the initial visit, the State mandates that the patient receive certain information. The patient must then wait at least 72 hours before returning for the second visit, when the patient can receive the abortion. Accordingly, each of Plaintiffs' patients must make at least two separate visits to a clinic or hospital, at least three full days apart, to obtain an abortion.[18] No exceptions are provided based on the distance a patient must travel to reach the clinic or hospital (which can be hundreds of miles each way). Moreover, because Missouri law requires that the doctor who provides the state-mandated information be the same doctor who performs the abortion, patients must coordinate their visits so that they can see the same physician. Because of the complexity of physicians' schedules (for example, many of the physician-providers only staff the RHS clinic on a part-time basis) and the fact that physicians, of course, are sometimes absent unexpectedly due to illness or other reasons, scheduling visits to comply with the same-doctor requirement can introduce further delay.

57.     Other patients experience delays because they cannot take multiple days off from work in close proximity without jeopardizing their jobs or the confidentiality of their pregnancy

---

[18]     In the case of medication abortions and certain surgical abortions, the patient will have to make a third visit to the clinic for pre- or post-procedure care.

and abortion decision. Others cannot arrange childcare for multiple days, or cannot do so without compromising the confidentiality of their decision. These individual circumstances all can lead to further delays.

58.    These economic and logistical barriers are particularly problematic for patients at or below the poverty line or otherwise low income, and they have a disproportionate effect on patients of color. In 2016, 24% of Black Missouri women lived below the federal poverty level, compared to 13.4% of white Missouri women.[19] In 2018, 57% of RHS's abortion patients were living at or below the poverty line.

59.    Accordingly, even some patients who discover they are pregnant and determine that they wish to obtain an abortion before 8, 14, 18, or 20 weeks LMP may be past the threshold for each respective Ban by the time they are able to overcome the various economic and logistical challenges they face in obtaining the procedure.

60.    As a result of Plaintiffs' patients' work and family obligations and other scheduling constraints, Missouri's mandatory delay and minimum-two-trip requirement forces many patients to delay their abortions by days or weeks. Although abortion is safer than carrying a pregnancy to term, delay increases the risks associated with the procedure.[20]

61.    Many of Plaintiffs' patients who seek care at or after 8, 14, 18, and 20 weeks LMP are facing very difficult circumstances, yet the overwhelming majority of those patients would fall outside the Ban's exception for medical emergencies. Some of these patients may

---

[19]    *Overview of the Economic Status of Women of Color in Missouri, 2016*, Status of Women in the States Fact Sheet (Inst. for Women's Pol'y Res.), Mar. 2018, at 3 (summarizing data from the U.S. Census Bureau's American Community Survey).

[20]    The risk of a serious complication also increases as a woman's pregnancy advances. Upadhyay et al., *supra* note 8, at 175.

have health conditions that are caused or exacerbated by their advancing pregnancies, but that may not fit within the Bans' exception for a "medical emergency" necessitating an "immediate" abortion to save those patients' lives or prevent substantial and irreversible impairment of a major bodily function. *See* Mo. Rev. Stat. §§ 188.015(7), .056(1), .057(1), .058(1), .375(3). For example, patients may seek abortions later in their pregnancies because of (i) maternal health conditions that worsen during the course of pregnancy, (ii) newly diagnosed medical conditions that cannot be aggressively treated without risking harm to the fetus, and (iii) medical conditions that arise during and are related to pregnancy. Other patients may receive diagnoses only after these gestational points in their pregnancies that their fetus has a severe or potentially lethal medical condition that would make life extremely difficult and painful. Other patients may be in violent or abusive relationships and may be concerned that carrying to term will tether them to their abuser. And still others may, as a result of the trauma they have endured from rape or incest or other violent abuse, be delayed in seeking care while they deal with the associated trauma.

62. Before providing any abortion care, Plaintiffs provide non-directive patient counseling, which means they listen to, support, and inform the patient, without directing her course of action. The process is designed to ensure that patients are well-informed with respect to all their options, including terminating the pregnancy, carrying the pregnancy to term and parenting, and carrying the pregnancy to term and placing the baby for adoption. In addition, the process is designed to ensure that the patient's choice is voluntary and not coerced.

63. Although some of Plaintiffs' patients disclose information about their reasons for seeking an abortion during these non-directive discussions, Plaintiffs do not require that patients

disclose any or all of their reasons for seeking an abortion, consistent with best medical practices.

64. Down syndrome is the common name for a genetic condition, known as Trisomy 21, which results from an extra copy (full or partial) of the 21st chromosome. The medical conditions and abilities of people with Down syndrome vary considerably, and the specific manifestation of Down syndrome cannot be known before birth. Many people with Down syndrome require significant care, sometimes through adulthood.

65. A variety of "screens" and more accurate diagnostic tests can help detect genetic, chromosomal, or structural conditions like Down syndrome. But most patients do not receive a confirmed Down syndrome diagnosis until well into the second trimester, generally at or after 18 weeks LMP.

66. The American College of Obstetricians and Gynecologists ("ACOG"), the preeminent professional association for OB/GYNs, recommends that all patients, regardless of age, be offered the option of screening or diagnostic testing for fetal genetic disorders, and that patients with positive screening test results be offered counseling and diagnostic testing.

67. Patients who receive a positive Down syndrome test result or diagnosis are typically referred by a high-risk OB/GYN to a genetic counselor for significant counseling. Counseling is intended to provide comprehensive, objective, and individualized information that addresses both the scientific aspect of any test result or diagnosis (*e.g.*, the reliability of specific test results) and the psychological effects of the results on the patient and any family members who may be involved. A patient who learns of a Down syndrome or other fetal diagnosis faces a complex decision that the patient should be able to make through self-reflection and discussion with anyone whom the patient chooses to involve in the process (such as a spouse, partner,

friend, family member, or doctor). It is critically important that patients have the information and support they need to make this serious decision, and also the ability to terminate a pregnancy safely, if that is what they decide is best for them.

68. While Plaintiffs, consistent with medical best practice, do not require that patients disclose any, much less all, of their reasons for seeking an abortion, Plaintiffs are aware that some of their patients seek abortions based solely or in part on a prenatal diagnosis of Down syndrome. These patients typically come to the clinic or hospital after having already undergone extensive counseling with genetic counselors and/or maternal-fetal medicine physicians, as well as having engaged in extensive reflection and conversation with the most important people in their lives.

69. Additionally, while Plaintiffs are unaware of any patient that has sought an abortion based solely on the sex or race of the embryo or fetus, patients at times ask the sex of the embryo or fetus when the ultrasound is performed, and the sex or race of the embryo or fetus may occasionally be mentioned during non-directive counseling.

**Irreparable Harm**

70. If H.B. 126 is permitted to take effect, Plaintiffs' patients will be subject to significant and irreparable constitutional, medical, emotional, and other harms for which no adequate remedy at law exists.

71. Specifically, the Gestational Age Bans in H.B. 126 will bar Plaintiffs from providing the vast majority of pre-viability abortions that their patients seek. Absent an injunction, Plaintiffs will have no choice but to turn away patients in need of abortion care after 8 weeks LMP (or 14, 18, or 20 weeks LMP, to the extent any of the earlier Gestational Age Bans are struck down while others remain).

72.     Some of Plaintiffs' patients will be prevented from obtaining abortion care entirely, and be forced to carry their pregnancies to term against their will—for some, even in the face of significant health risks that nevertheless would not qualify as a "medical emergency" under the Bans.  Some will attempt to seek abortions outside the medical system (with all the risks that may entail).  Others will be forced to delay seeking an abortion (increasing the risk to their health and well-being) and will have to attempt to obtain care in other states (and incur all the associated economic and logistical burdens).

73.     As between maintaining a pregnancy or having an abortion, H.B. 126 would mandate the medically riskier course at or after 8 weeks (or 14, 18, or 20 weeks) LMP, regardless of whether it is contrary to an individual patient's will.  Forcing a patient to continue a pregnancy against her will can pose a risk to her physical, mental, and emotional health, and—in a state that ranks ninth from the bottom nationwide for maternal survival—even her life, as well as to the stability and well-being of her family, including her existing children.

74.     The burden of the Gestational Age Bans is expected to fall most acutely on the neediest patients, because financial resources often dictate how quickly patients are able to receive the abortion care they seek.  The overwhelming majority of RHS patients are poor or low income and, indeed, the majority of abortion patients in Missouri are women of color.  These are the very constituencies that stand to be harmed the most by the Bans.

75.     The Reason Ban, if it takes effect, would prohibit Plaintiffs' patients from obtaining pre-viability abortions if the provider has knowledge that a patient's abortion decision is based "solely" on particular reasons singled out by the State.  It could also force Plaintiff McNicholas , as well as other physicians providing abortions in Missouri, to probe patients'

23

reasons for seeking an abortion (even where that information has not been volunteered) in order to determine and document that performance of the abortion will not violate the Reason Ban.

76.     Thus, if the physician knows that a patient has had a "prenatal diagnosis, test, or screening indicating Down Syndrome or the potential of Down Syndrome," or if the patient asks the sex of the fetus when the ultrasound is performed, or otherwise mentions the embryo or fetus' race or sex in the non-directive patient counseling, the physician will be put in the position of having to probe the patient's reasons for seeking an abortion (in violation of best medical practices and their patient's constitutionally protected privacy interests) in order to determine and document that the abortion does not violate the Reason Ban or pose a risk that the physician may lose his or her medical license by performing it.

77.     Moreover, if the physician knows the patient seeks an abortion solely because of a potential Down syndrome diagnosis, the physician will be barred under the Reason Ban from performing the procedure.   As noted, Plaintiffs are unaware that any of their patients have ever sought an abortion solely because of the race or sex of the embryo or fetus.

78.     Plaintiffs wish to continue providing safe and compassionate pre-viability abortion care to patients who have knowingly and voluntarily decided to terminate their pregnancies, regardless of their reason for doing so and without having to inquire—in violation of best medical practice and constitutionally protected privacy interests—about the reasons behind this most personal and protected of patients' decisions.

## CLAIMS FOR RELIEF

### COUNT I

**(Substantive Due Process – 8-Week Ban)**

79. Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 78.

80. By imposing a ban on abortion prior to viability, the 8-Week Ban violates Plaintiffs' patients' rights to privacy and liberty guaranteed by the Fourteenth Amendment to the United States Constitution.

### COUNT II

**(Substantive Due Process – 14-Week Ban)**

81. Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 78.

82. By imposing a ban on abortion prior to viability, the 14-Week Ban violates Plaintiffs' patients' rights to privacy and liberty guaranteed by the Fourteenth Amendment to the United States Constitution.

### COUNT III

**(Substantive Due Process – 18-Week Ban)**

83. Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 78.

84. By imposing a ban on abortion prior to viability, the 18-Week Ban violates Plaintiffs' patients' rights to privacy and liberty guaranteed by the Fourteenth Amendment to the United States Constitution.

## COUNT IV

### (Substantive Due Process – 20-Week Ban)

85.     Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 78.

86.     By imposing a ban on abortion prior to viability, the 20-Week Ban violates Plaintiffs' patients' rights to privacy and liberty guaranteed by the Fourteenth Amendment to the United States Constitution.

## COUNT V

### (Substantive Due Process – Reason Ban)

87.     Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 78.

88.     By imposing a ban on abortion prior to viability, the Reason Ban violates Plaintiffs' patients' rights to privacy and liberty guaranteed by the Fourteenth Amendment to the United States Constitution.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs ask this Court:

A.      To immediately issue a temporary restraining order and/or preliminary injunction, later to be made permanent, restraining Defendants, their employees, agents, and successors in office from enforcing the challenged provisions of H.B. 126 to the extent those provisions apply to pre-viability abortions;

B.      To enter a judgment declaring that Sections 188.038, 188.056, 188.057, 188.058, and 188.375 violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution to the extent those provisions apply to pre-viability abortions;

C.    To enter a judgment declaring that Sections 188.015(5) and 188.052(1) are invalid because they are not severable from the invalid provisions of Section 188.038;

D.    To award Plaintiffs their attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

E.    To grant such other and further relief as the Court deems just and proper.

Dated:  July 30, 2019                    Respectfully submitted,

LAW OFFICE OF ARTHUR BENSON

*/s/ Arthur A. Benson II*

*/s/ Jamie Kathryn Lansford*
Arthur A. Benson II, #21107
Jamie Kathryn Lansford, #31133
4006 Central Avenue
Kansas City, MO 64111
Tel: (816) 531-6565
abenson@bensonlaw.com
jlansford@bensonlaw.com

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Claudia Hammerman (*Pro hac vice application to be filed*)
Daniel J. Klein (*Pro hac vice application to be filed*)
Allison C. Penfield (*Pro hac vice application to be filed*)
Melina M. Meneguin Layerenza (*Pro hac vice application to be filed*)
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
chammerman@paulweiss.com
daklein@paulweiss.com
apenfield@paulweiss.com
mmeneguin@paulweiss.com

27

Jane B. O'Brien (*Pro hac vice application to be filed*)
Melissa R. Alpert (*Pro hac vice application to be filed*)
2001 K Street, N.W.
Washington, DC 20006
Tel: (202) 223-7300
jobrien@paulweiss.com
malpert@paulweiss.com

PLANNED PARENTHOOD FEDERATION OF AMERICA

Susan Lambiase (*Pro hac vice application to be filed*)
123 William St., Floor 9
New York, NY 10038
Tel: (212) 541-7800
susan.lambiase@ppfa.org

Julie Murray (*Pro hac vice application to be filed*)
1110 Vermont Avenue, N.W., Ste. 300
Washington, DC 20005
Tel: (202) 803-4045
julie.murray@ppfa.org

AMERICAN CIVIL LIBERTIES UNION FOUNDATION, INC.

Andrew D. Beck (*Pro hac vice application to be filed*)
Fiona Kaye (*Pro hac vice application to be filed*)
125 Broad St.
New York, NY 10004
Tel: (212) 549-2633
abeck@aclu.org
fkaye@aclu.org

AMERICAN CIVIL LIBERTIES UNION OF MISSOURI
FOUNDATION

Anthony E. Rothert, #44827
Jessie Steffan, #64861
Omri E. Praiss, #41850
906 Olive Street, Suite 1130
St. Louis, MO 63108
Tel: (314) 652-3114
trothert@aclu-mo.org
jsteffan@aclu-mo.org
opraiss@aclu-mo.org

Gillian R. Wilcox, #61278
406 West 34th Street, Suite 420
Kansas City, MO 64111
Tel: (816) 470-9938
gwilcox@aclu-mo.org

*Attorneys for Plaintiffs*

**CERTIFICATE OF NOTICE**

I hereby certify that a copy of the above and foregoing was transmitted via electronic mail this 30th day of July, 2019, on:

D. John Sauer  #58721
Solicitor General
Office of Missouri Attorney General Eric S. Schmitt
P.O. Box 899
Jefferson City, Missouri 65102
(573) 751-8870
(573) 751-0774 (telefacsimile)
John.Sauer@ago.mo.gov

/s/ Jamie Kathryn Lansford
Jamie Kathryn Lansford
*Attorney for Plaintiffs*