**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

REPRODUCTIVE HEALTH SERVICES OF ) 
PLANNED PARENTHOOD OF THE ST. LOUIS ) 
REGION, INC., et al., )
                                                       )
       Plaintiffs, )
                                                       )    Case No. 2:19-cv-4155-HFS
v. )
                                                       )
MICHAEL L. PARSON, in his official capacity )
as Governor of the State of Missouri, et al., )
                                                       )
       Defendants. )

**STATE DEFENDANTS' SUGGESTIONS IN OPPOSITION TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 2

ARGUMENT ........................................................................................................................ 7

   I.    Plaintiffs Are Not Likely to Succeed on the Merits in Their Facial Challenges. ................ 7

      A.  Plaintiffs lack third-party standing or a cause of action under 42 U.S.C. § 1983 to assert the interests of their patients, and they lack Article III standing and ripeness to challenge the sex-based and race-based Anti-Discrimination Law. ........................................................... 7

      B.  Plaintiffs' argument that any prohibition on abortion prior to viability is *per se* unconstitutional has no merit. ............................................................................................... 8

      C.  Plaintiffs cannot assert any facial challenges to the provisions of HB 126 because they fail to satisfy the large-fraction test. .................................................................................... 13

      D.  The Gestational-Age Restrictions Are Valid Under *Casey*. ........................................... 17

      E.  The Anti-Discrimination Law Satisfies Strict Scrutiny or Any Other Level of Constitutional Scrutiny. .................................................................................................... 25

      F.  Every provision and individual application of HB 126 is severable. ............................. 33

II.   The Other Three *Dataphase* Factors Favor the State. .......................................................... 35

CONCLUSION .................................................................................................................. 37

# TABLE OF AUTHORITIES

## Cases

*1-800-411-Pain Referral Service, LLC v. Otto*,
744 F.3d 1045 (8th Cir. 2014) ................................................. 36

*Advantage Media, LLC v. City of Eden Prairie*,
456 F.3d 793 (8th Cir. 2006) ................................................. 8

*Ayotte v. Planned Parenthood of Northern New England*,
546 U.S. 320 (2006) ................................................. 16, 33, 34

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*,
481 U.S. 537 (1987) ................................................. 26

*Bethune-Hill v. Virginia State Bd. of Elections*,
137 S. Ct. 788 (2017) ................................................. 12

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983) ................................................. 26

*Box v. Planned Parenthood of Indiana and Eastern Ky.*,
139 S. Ct. 1780 (2019) ................................................. 9, 31, 32

*Brecht v. Abrahamson*,
507 U.S. 619 (1993) ................................................. 9

*Brockett v. Spokane Arcades, Inc.*,
472 U.S. 491 (1985) ................................................. 16, 34

*Bucklew v. Precythe*,
139 S. Ct. 1112 (2019) ................................................. 23

*Chaplinsky v. New Hampshire*,
315 U.S. 568 (1942) ................................................. 12

*Cincinnati Women's Services, Inc. v. Taft*,
468 F.3d 361 (6th Cir. 2006) ................................................. 15

*City of Akron v. Akron Ctr. for Reprod. Health, Inc.*,
462 U.S. 416 (1983) ................................................. 33

*Coalition for Economic Equity v. Wilson*,
122 F.3d 718 (9th Cir. 1997) ................................................. 36

*Comprehensive Health of Planned Parenthood Great Plains v. Hawley,*
    903 F.3d 750 (8th Cir. 2018) ........................................................ 10

*Dataphase Sys., Inc. v. C.L. Sys., Inc.,*
    640 F.2d 109 (8th Cir. 1981) (en banc) ................................. 7, 35

*Dorchy v. Kansas,*
    264 U.S. 286 (1924) ...................................................................... 34

*Drakes Bay Oyster Co. v. Jewell,*
    747 F.3d 1073 (9th Cir. 2014) .................................................... 37

*Edwards v. Beck,*
    786 F.3d 1113 (8th Cir. 2015) ............................................ 10, 33

*Fisher v. University of Texas,*
    136 S. Ct. 2198 (2016) ................................................................ 12

*Garrett v. Clarke,*
    147 F.3d 745 (8th Cir. 1998) ....................................................... 8

*Gonzales v. Carhart,*
    550 U.S. 124 (2007).................. 11, 12, 16, 19, 20, 21, 22, 25, 36

*Heart of Atlanta Motel v. United States,*
    379 U.S. 241 (1964) ..................................................................... 26

*Whole Woman's Health v. Hellerstedt,*
    136 S. Ct. 2292 (2016)........................................................ 17, 18

*Johnson v. California,*
    543 U.S. 499 (2005)..................................................................... 12

*June Med. Servs. LLC v. Gee,*
    905 F.3d 787 (5th Cir. 2018) ............................................. 15, 16

*Karlin v. Foust,*
    188 F.3d 446 (7th Cir. 1999) ..................................................... 10

*Kovacs v. Cooper,*
    336 U.S. 77 (1949)....................................................................... 12

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004)....................................................................... 7

*Leavitt v. Jane L.,*
    518 U.S. 137 (1996)..................................................................... 33

*Maryland v. King*,
 567 U.S. 1301 (2012) .................................................... 36

*MBI Energy Servs. v. Hoch*,
 929 F.3d 506 (8th Cir. 2019) ........................................ 13

*MKB Management Corp. v. Stenehjem*,
 795 F.3d 768 (8th Cir. 2015) ...................................... 9, 10

*N.Y. State Club Ass'n v. City of New York*,
 487 U.S. 1 (1988) ................................................ 26, 27, 30

*Nken v. Holder*,
 556 U.S. 418 (2009) .................................................... 37

*Peterson v. Village of Downers Grove*,
 No. 14-C-09851, 2016 WL 427566 (N.D. Ill. Feb. 4, 2016) ................ 37

*Planned Parenthood of Arkansas & E. Oklahoma v. Jegley*,
 864 F.3d 953 (8th Cir. 2017) .................................... 14, 15, 17

*Planned Parenthood of Greater Texas Surgical Health Services v. Abbott*,
 748 F.3d 583 (5th Cir. 2014) ........................................ 15

*Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*,
 734 F.3d 406 (5th Cir. 2013) ...................................... 36, 37

*Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r of Indiana State Dep't of Health*,
 917 F.3d 532 (7th Cir. 2018) ........................................ 9, 25

*Planned Parenthood of Southeastern Pa. v. Casey*,
 505 U.S. 833 (1992) ................... 8, 9, 11, 12, 13, 14, 15, 17, 18, 21, 24, 33

*Roberts v. U.S. Jaycees*,
 468 U.S. 609 (1984) .................................................... 26

*Rodgers v. Danforth*,
 486 S.W.2d 258 (Mo. banc 1972) .................................... 18

*Roe v. Wade*,
 410 U.S. 113 (1973) .................................................. 8, 11

*Roper v. Simmons*,
 543 U.S. 551 (2005) .................................................... 23

*Tension Envelope Corp. v. JBM Envelope Co.*,
 876 F.3d 1112 (8th Cir. 2017) ........................................ 13

*United States v. L.A. Tucker Truck Lines, Inc.,*
344 U.S. 33 (1952) ................................................................. 9

*United States v. Oakland Cannabis Buyers' Coop.,*
532 U.S. 483 (2001) ............................................................... 37

*United States v. Raines,*
362 U.S. 17 (1960) ................................................................ 16

*United States v. Salerno,*
481 U.S. 739 (1987) .............................................................. 15

*Virginian Ry. Co. v. Sys. Fed'n No. 40,*
300 U.S. 515 (1937) .............................................................. 36

*Washington State Grange v. Washington State Republican Party,*
552 U.S. 442 (2008) .............................................................. 15

*Washington v. Glucksberg,*
521 U.S. 702 (1997) .............................................................. 20

*Watkins Inc. v. Lewis,*
346 F.3d 841 (8th Cir. 2003) ............................................. 7, 35

*Whole Women's Health v. Lakey,*
769 F.3d 285 (5th Cir. 2014) ............................................... 15

*Williams-Yulee v. Florida Bar,*
135 S. Ct. 1656 (2015) ......................................................... 12

*Wyoming v. Oklahoma,*
502 U.S. 437 (1992) .............................................................. 34

## Statutes

29 U.S.C. Section 794 ................................................................ 26

42 U.S.C. Section 1983 ..................................................... ii, 1, 7

42 U.S.C. Section 12132 .............................................................. 26

Article III, Section 29 of the Constitution ................................. 2

Mo. Rev. Stat. Section 1.140 ..................................................... 34

Mo. Rev. Stat. Section 188.018 ........................................ 5, 6, 34

Mo. Rev. Stat. Section 188.026.2(1)-(5) ..................................... 2

Mo. Rev. Stat. Section 188.026.2(2) ........................................................................ 18

Mo. Rev. Stat. Section 188.026.2(4) ........................................................................ 18

Mo. Rev. Stat. Section 188.026.2(6)-(9) ..................................................................... 2

Mo. Rev. Stat. Section 188.026.2(10)-(11) .................................................................. 2

Mo. Rev. Stat. Section 188.026.2(12)-(13) .................................................................. 2

Mo. Rev. Stat. Section 188.026.2(13) ...................................................................... 18

Mo. Rev. Stat. Section 188.026.2(14)-(16) ............................................................ 3, 19

Mo. Rev. Stat. Section 188.026.2(17)-(23) ............................................................ 3, 22

Mo. Rev. Stat. Section 188.026.2(24) .................................................................. 21, 22

Mo. Rev. Stat. Section 188.026.2(24)-(25) ................................................................. 3

Mo. Rev. Stat. Section 188.026.2(27)-(29) ................................................................. 3

Mo. Rev. Stat. Section 188.026.2(27)-(32) ............................................................... 23

Mo. Rev. Stat. Section 188.026.2(28), (29)(a)-(b) ..................................................... 23

Mo. Rev. Stat. Section 188.026.2(29)(b) ................................................................. 22

Mo. Rev. Stat. Section 188.026.2(30)-(32) ................................................................. 3

Mo. Rev. Stat. Section 188.026.2(31) ...................................................................... 23

Mo. Rev. Stat. Section 188.026.2(32) ...................................................................... 23

Mo. Rev. Stat. Section 188.026.2(33)(a)-(d) .......................................................... 3, 21

Mo. Rev. Stat. Section 188.026.2(34) ........................................................................ 3

Mo. Rev. Stat. Section 188.026.2(35) ............................................................. 4, 14, 17

Mo. Rev. Stat. Section 188.026.2(35)(c) .................................................................. 20

Mo. Rev. Stat. Section 188.026.2(35)(d) .................................................................. 19

Mo. Rev. Stat. Section 188.038 ....................................................................... 5, 6, 25, 32

Mo. Rev. Stat. Section 188.038.1(1)-(2) ..................................................................... 5

Mo. Rev. Stat. Section 188.038.1(1)-(6) ..................................................................... 5

Mo. Rev. Stat. Section 188.038.1(1), (3), (6) ............................................ 26

Mo. Rev. Stat. Section 188.038.1(2)-(5) ................................................... 28

Mo. Rev. Stat. Section 188.038.1(3)-(4) ..................................................... 6

Mo. Rev. Stat. Section 188.038.1(4) .......................................................... 31

Mo. Rev. Stat. Section 188.038.1(5) ............................................................ 6

Mo. Rev. Stat. Section 188.038.1(6) ............................................................ 6

Mo. Rev. Stat. Section 188.056.1 ............................................................ 4, 5

Mo. Rev. Stat. Section 188.057.1 ................................................................ 4

Mo. Rev. Stat. Section 188.058.1 ................................................................ 5

Mo. Rev. Stat. Section 188.375 ................................................................... 5

Mo. Rev. Stat. Sections 1.205.1(1)-(2), 1.205.2, 188.010 .......................... 18

## Other Authorities

*As-Applied and Facial Challenges and Third-Party Standing*,
  113 HARV. L. REV. 1321 (2000) ............................................................ 16

HB 126 .................. ii, 1, 2, 4, 5, 7, 13, 14, 17, 18, 19, 20, 21, 22, 23, 26, 28, 31, 32, 33, 34, 35, 36

# INTRODUCTION

Plaintiffs' Motion for Preliminary Injunction and/or Temporary Restraining Order should be denied for many reasons. (1) Plaintiffs lack third-party standing to assert the rights of their patients, because they do not plead any "close relationship" or "hindrance" to their patients' asserting their own interests. (2) Plaintiffs lack a cause of action for their claims because 42 U.S.C. § 1983 does not authorize claims on behalf of third parties. (3) Plaintiffs lack standing and ripeness to challenge the race- and sex-based discrimination provisions because they are unaware of any patient who may violate them. (4) Plaintiffs' sole argument—that *Casey* renders any pre-viability restriction *per se* unconstitutional—reflects an unreasonable interpretation of *Casey* that yields absurd conclusions. (5) Plaintiffs cannot satisfy the "large fraction" test, so all their facial challenges fail. (6) The Gestational Age Restrictions of HB 126 are subject, at most, to *Casey*'s undue-burden test, and the compelling state interests that these restrictions advance decisively outweigh Plaintiffs' asserted interest in not having to obtain an abortion earlier in pregnancy. (7) The Anti-Discrimination provisions enacted by HB 126 satisfy strict scrutiny or any lesser standard of review, because they advance compelling state interests and are narrowly tailored to do so. (8) The balancing of equities and the public interest strongly favor the denial of a preliminary injunction, because the State's interests in protecting fetal life, preventing the infliction of horrible pain on second-trimester fetuses, protecting women from the "exponentially" increased risks of post-abortion physical and psychological complications, promoting the integrity of the medical profession, eradicating invidious discrimination, and preventing the elimination of persons with Down Syndrome as a class (among many others), decisively outweigh the Plaintiffs' asserted interests in being able to obtain abortions later in pregnancy, and in being able to target persons for abortion based on sex, race, and Down Syndrome.

1

**STATEMENT OF FACTS**

On May 17, 2019, the Missouri General Assembly enacted House Bill No. 126 ("HB 126"), and Governor Parson signed HB 126 into law on May 24, 2019. *See* House Bill No. 126 (2019), *available at* https://legiscan.com/MO/text/HB126/2019 (attached as Exhibit A). The Missouri Senate passed HB 126 by a vote of 24-10, and the Missouri House passed H.B. 126 by a vote of 110-44. *See* May 15, 2019 Senate Journal, S 1252; May 17, 2019 House Journal, H 2728-2729. The emergency clause of HB 126 was passed by two-thirds of the members of each House, as required by Article III, § 29 of the Constitution. The relevant provisions of HB 126 will become effective on August 28, 2019.

In HB 126, the Missouri General Assembly made fifty detailed factual findings in support of its conclusions. *See* HB 126, Ex. A, at 6-11 (codified at Mo. Rev. Stat. §§ 188.026.2(1)-(36), 188.026.5(1)-(8), 188.038.1(1)-(6)). The General Assembly found that a genetically distinct human being is created at conception and that Missouri law has long recognized that life begins at conception. *Id.* at 6-7; Mo. Rev. Stat. § 188.026.2(1)-(5). The General Assembly found that an unborn child's heartbeat is detectable at six to eight weeks' gestational age, and that the heartbeat is an important indicator of independent human life. *Id.* at 7; Mo. Rev. Stat. § 188.026.2(6)-(9). The legislature also found that medicine, science, and Missouri law focus on markers of fetal development other than "viability," including "presence of a heartbeat, brain development, . . . and the ability to experience pain." *Id.* at 8; Mo. Rev. Stat. § 188.026.2(10)-(11). The legislature found that a detectable heartbeat is "a reliable indicator of a viable pregnancy," where "viable" is understood in a more scientifically precise manner than sometimes used in prior Supreme Court decisions. *Id.*; Mo. Rev. Stat. § 188.026.2(12)-(13). The General Assembly found that circulatory,

respiratory, and brain-wave functions develop during the first trimester of pregnancy, and that Missouri law identifies these functions as indicia of life. *Id.*; Mo. Rev. Stat. § 188.026.2(14)-(16).

The General Assembly made detailed factual findings about the development of the unborn child's pain receptivity and capability to feel pain, including detailed scientific findings regarding the neurophysical basis of pain-capability between 14 weeks and 20 weeks' gestation. *Id.* at 9; Mo. Rev. Stat. § 188.026.2(17)-(23). The General Assembly found that the predominant method of second-trimester abortion in Missouri is dilation and evacuation ("D&E"), which "includes the dismemberment, disarticulation, and exsanguination of the unborn child" while still alive, and that this method of abortion is "brutal" and dehumanizing. *Id.* at 10; Mo. Rev. Stat. § 188.026.2(24)-(25). The General Assembly concluded that evolving standards of decency mandate that "Missouri should prohibit the brutal and painful D & E abortion method at fourteen weeks gestational age or later," because Missouri would never permit convicted murderers or even animals to be treated with such brutality. *Id.* at 10-11; Mo. Rev. Stat. § 188.026.2(27)-(29).

The General Assembly also found that "the opinion of the world community, reflected in the law of the United Nations' 193 member states and six other entities," is that "most abortions are prohibited after twelve weeks gestational age or later," and that American public opinion consistently agrees with this consensus. *Id.* at 11; Mo. Rev. Stat. § 188.026.2(30)-(32).

In addition, the General Assembly found that "abortion procedures performed later in pregnancy have a higher medical risk for women," and that "the relative risk increases exponentially at later gestational ages" after eight weeks' gestation. *Id.* at 11; Mo. Rev. Stat. § 188.026.2(33)(a)-(d)). The General Assembly found that the "long-term physical and psychological consequences of abortion for women" also "increase as abortions are performed or induced at later gestational ages." *Id.*; Mo. Rev. Stat. § 188.026.2(34).

3

The General Assembly found that "a large percentage of women who have an abortion performed or induced upon them in Missouri each year are at less than eight weeks gestational age, a large majority are at less than fourteen weeks gestational age, a larger majority are at less than eighteen weeks gestational age, and an even larger majority are at less than twenty weeks gestational age." *Id.* at 12; Mo. Rev. Stat. § 188.026.2(35). Therefore, the General Assembly found, "a prohibition on performing or inducing an abortion at eight weeks gestational age or later, with a medical emergency exception, does not amount to a substantial obstacle for a large fraction of women for whom the prohibition is relevant, which is pregnant women in Missouri who are seeking an abortion while not experiencing a medical emergency." *Id.* The General Assembly also found that "the burden that a prohibition on performing or inducing an abortion at eight, fourteen, eighteen, or twenty weeks gestational age or later . . . is outweighed by the benefits conferred on" (1) "women more advanced in pregnancy who are at greater risk of harm from abortion"; (2) "unborn children at later stages of development"; (3) "the medical profession, by preserving its integrity and fulfilling its commitment to do no harm"; and (4) "society, by fostering respect for human life, born and unborn, at all stages of development, and lessening societal tolerance of violence against innocent human life." *Id.*

In light of these detailed and extensive findings, the General Assembly provided in Section 188.056 that "no abortion shall be performed or induced upon a woman at eight weeks gestational age or later, except in cases of medical emergency." HB 126, Ex. A, at 26; Mo. Rev. Stat. § 188.056.1. In the alternative, the General Assembly provided in Section 188.057 that "no abortion shall be performed or induced upon a woman at fourteen weeks gestational age or later, except in cases of medical emergency. *Id.* at 27; Mo. Rev. Stat. § 188.057.1. And the legislature further provided that "no abortion shall be performed or induced upon a woman at eighteen weeks

gestational age or later, except cases of medical emergency." *Id.* at 28; Mo. Rev. Stat. § 188.058.1. In addition, the legislature provided that "no abortion shall be performed or induced upon a woman carrying a late-term pain-capable unborn child, except in cases of medical emergency," where "the phrase 'late-term pain-capable unborn child' shall mean an unborn child at twenty weeks gestation or later." *Id.* at 28; Mo. Rev. Stat. § 188.375 (collectively, the "Gestational Age Restrictions").

Each of these provisions is subject to a robust severability clause: "If any one or more provisions, subsections, sentences, clauses, phrases or words of this section or the application thereof to any person, circumstance, or period of gestational age is found to be unenforceable, unconstitutional, or invalid by a court of competent jurisdiction, the same is hereby declared to be severable and the balance of the section shall remain effective notwithstanding such unenforceability, unconstitutionality, or invalidity." *See id.* at 27-29; Mo. Rev. Stat. §§ 188.056.4, 188.057.4, 188.058.4, 188.375.9. The same severability clause also applies to all provisions of Chapter 188 of the Missouri Revised Statutes. *Id.* at 6; Mo. Rev. Stat. § 188.018.

HB 126 enacted a separate restriction on abortions based solely on race, sex, or Down Syndrome. *See* HB 126, Ex. A, at 23-24; Mo. Rev. Stat. § 188.038 (the "Anti-Discrimination Law"). The General Assembly made specific factual findings in support of the Anti-Discrimination Law. *Id.* at 23; Mo. Rev. Stat. § 188.038.1(1)-(6). First, the General Assembly found that "removing vestiges of any past bias or discrimination against pregnant women, their partners, and their family members, including their unborn children," is an important state interest, and that "ending any current bias or discrimination against pregnant women, their partners, and their family members, including their unborn children," is also an important state interest. *Id.* at 23; Mo. Rev. Stat. § 188.038.1(1)-(2). The General Assembly further found that "the historical relationship of bias or discrimination by some family planning programs or policies toward poor

and minority populations . . . must be rejected," and that both the abortion rate and the repeat abortion rate are significantly higher for minority women than for non-minority women in Missouri.  *Id.* at 24; Mo. Rev. Stat. § 188.038.1(3)-(4).  In addition, the legislature found that "performing or inducing an abortion because of the sex of the unborn child is repugnant to the values of equality of females and males and the same opportunities for girls and boys, and further a false mindset of female inferiority."  *Id.*; Mo. Rev. Stat. § 188.038.1(5).

Further, the General Assembly found that "government has a legitimate interest in preventing the abortion of unborn children with Down Syndrome because it is a form of bias or disability discrimination and victimizes the disabled unborn child at his or her most vulnerable stage."  *Id.*; Mo. Rev. Stat. § 188.038.1(6).  "Eliminating unborn children with Down Syndrome raises grave concerns for the lives of those who do live with disabilities."  *Id.*  "It sends a message of dwindling support for their unique challenges, fosters a false sense that disability is something that could have been avoidable, and is likely to increase the stigma associated with disability."  *Id.*

In light of these findings, the General Assembly provided that "no person shall perform or induce an abortion on a woman if the person knows that the woman is seeking the abortion solely because of a prenatal diagnosis, test, or screening indicating Down Syndrome or the potential of Down Syndrome in an unborn child."  *Id.*; Mo. Rev. Stat. § 188.038.2.  The General Assembly provided that "no person shall perform or induce an abortion on a woman if the person knows that the woman is seeking the abortion solely because of the sex or race of the unborn child."  *Id.*; Mo. Rev. Stat. § 188.038.3.  These Anti-Discrimination provisions are subject to the same robust severability clause.  *See id.* at 6; Mo. Rev. Stat. § 188.018.

Though Plaintiffs have been on notice of all these detailed legislative findings since at least May 24, 2019, when HB 126 was enacted, their preliminary-injunction briefing provides no evidence or argument to address or refute them. *See* Doc. 3.

## ARGUMENT

Preliminary injunctive relief is "an extraordinary remedy," and "the burden of establishing the propriety of an injunction is on the movant." *Watkins Inc. v. Lewis*, 346 F.3d 841, 44 (8th Cir. 2003). The Court considers four factors in determining whether to grant a temporary injunction: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to other litigants; and (4) the public interest." *Id.* (citing *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). Here, all four factors favor the State.

## I.      Plaintiffs Are Not Likely to Succeed on the Merits in Their Facial Challenges.

Plaintiffs assert sweeping facial challenges to five provisions of HB 126—the four Gestational Age Restrictions, and the Anti-Discrimination Law. *See* Doc. 1, ¶¶ 80-88. None of these challenges is likely to succeed on the merits.

### A.   Plaintiffs lack third-party standing or a cause of action under 42 U.S.C. § 1983 to assert the interests of their patients, and they lack Article III standing and ripeness to challenge the sex-based and race-based Anti-Discrimination Law.

As an initial matter, Plaintiffs are unlikely to succeed on the merits for three reasons related to standing. *First*, they assert only derivative claims premised on the constitutional rights of their future patients, *see* Doc. 1, ¶¶ 80, 82, 84, 86, 88, but they lack third-party standing to assert the rights of their patients because they have not pled facts to support a "close relationship" with those third parties or any "hindrance" to their ability to assert their own rights. *See, e.g., Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). *Second*, Plaintiffs assert all their claims under 42 U.S.C. § 1983, *see* Doc. 1, ¶ 4 & pp. 26-27, but Section 1983 does not create a cause action to assert the

rights or claims of third parties. *See, e.g., Garrett v. Clarke*, 147 F.3d 745, 746 (8th Cir. 1998); *Advantage Media, LLC v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006). *Third*, Plaintiffs lack Article III standing and ripeness to challenge the race-based and sex-based provisions of the Anti-Discrimination Law because they concede that they are unaware of any patients who are likely to violate that law, *see* Doc. 1, ¶¶ 69, 77; Doc. 3, at 8 n.6; McNicholas Decl. ¶¶ 59-60. For the reasons stated in greater detail in the State Defendants' Suggestions in Support of Motion to Dismiss, filed contemporaneously and incorporated by reference, Plaintiffs are unlikely to succeed the merits for each of these reasons.

### B. Plaintiffs' argument that any prohibition on abortion prior to viability is *per se* unconstitutional has no merit.

Plaintiffs present only one argument on the merits in favor of all five of their claims—*i.e.*, that *Casey* supposedly established an absolute liberty to abort a pre-viability fetus that no government may ever restrict for any reason, no matter how compelling. Doc. 3, at 9-11. In fact, their entire argument on the merits spans less than three pages of their brief. *See id.* Plaintiffs contend that, under *Roe* and *Casey*, "States may not enact **any** pre-viability ban on abortion," and that any prohibition of pre-viability abortion for any reason is "*per se* unconstitutional." *Id.* at 9 (emphasis in original). This argument lacks merit for several reasons.

First, neither *Roe* nor *Casey* considered a gestational-age restriction or anti-discrimination provision relating to pre-viability abortion, so neither case decided the questions presented here. *See Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 844 (1992) (addressing Pennsylvania's 24-hour informed-consent provision, parental-consent provision, spousal-notification provision, and abortion-facility reporting requirements); *Roe v. Wade*, 410 U.S. 113, 119 (1973), *overruled in part by Casey*, 505 U.S. 833 (addressing a complete prohibition on all abortions with an exception for saving the mother's life). At the time of *Casey*, Pennsylvania had

a prohibition on sex-selective abortions, but the petitioners in *Casey* declined to challenge that provision. *See* Br. for Respondents in *Casey*, 505 U.S. 833, 1992 WL 12006423, at *4.

Where a question is "not . . . raised in briefs or argument nor discussed in the opinion of the Court," the case "is not binding precedent on this point." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952); *see also Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) (holding that no binding precedent exists where the Court "ha[s] never squarely addressed the issue"). As Justice Thomas recently stated in this precise context: "Whatever else might be said of *Casey*, it did not decide whether the Constitution requires States to allow eugenic abortions. It addressed the constitutionality of only 'five provisions of the Pennsylvania Abortion Control Act of 1982' that were said to burden the supposed constitutional right to abortion. None of those provisions prohibited abortions based solely on race, sex, or disability." *Box v. Planned Parenthood of Indiana and Eastern Ky.*, 139 S. Ct. 1780, 1792 (2019) (Thomas, J., concurring) (quoting *Casey*, 505 U.S. at 844). "[T]he constitutionality of other laws like [Missouri's] thus remains an open question." *Id.* "*Casey* did not consider the validity of an anti-eugenics law. Judicial opinions are not statutes; they resolve only the situations presented for decision." *Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r of Indiana State Dep't of Health*, 917 F.3d 532, 536 (7th Cir. 2018) (Easterbrook, J., dissenting from denial of rehearing en banc).

Further, no Eighth Circuit precedent is directly controlling here either. Plaintiffs do not contend that the Eighth Circuit has ever addressed a 14-week restriction, an 18-week restriction, a 20-week restriction, or an Anti-Discrimination Law applicable to abortion. *See* Doc. 3, at 9-11. To be sure, in 2015, the Eighth Circuit invalidated Arkansas and North Dakota statutes that prohibited pre-viability abortions based on the presence of a detectable fetal heartbeat, which are similar to Missouri's 8-week restriction. *See MKB Management Corp. v. Stenehjem*, 795 F.3d

768, 770 (8th Cir. 2015); *Edwards v. Beck*, 786 F.3d 1113, 1117 (8th Cir. 2015). But in both cases, the Eighth Circuit repeatedly emphasized that its holding was based on the factual record before it, and that a future State (like Missouri) would have the opportunity to create its own factual and scientific record to justify its own restrictions. *Edwards*, 786 F.3d at 1117 (holding that *Casey* "render[s] more critical the parties' obligation to assure that the court has the benefit of an adequate scientific record in cases where the standard is applied"); *id.* at 1119 ("This case underscores the importance of the parties, particularly the state, developing the record in a meaningful way . . . ."); *MKB*, 795 F.3d at 773 (quoting the same language from *Edwards*); *MKB*, 795 F.3d at 770 (noting that the court's decision was based on "the current state of medical science"). The Eighth Circuit recently reaffirmed this principle in *Comprehensive Health of Planned Parenthood Great Plains v. Hawley*, 903 F.3d 750 (8th Cir. 2018), holding that Missouri is entitled to the opportunity to make a factual record to defend its own regulations of abortion. *Hawley*, 903 F.3d at 758; *see also Karlin v. Foust*, 188 F.3d 446, 483-85 (7th Cir. 1999).

Here, to justify its restrictions, Missouri submits extensive evidence that was absent from the records in *MKB*, *Edwards*, *Casey*, and *Roe*. This evidence relates to issues that no federal appellate court has ever addressed in this context, such as (among many others) the fetus's capacity to feel pain, the emerging global consensus against second-trimester abortion, the brutal and dehumanizing nature of second-trimester abortion procedures, the adverse impact on the integrity of the medical profession, the critical stigma associated with attempts to "eliminate" Down Syndrome by abortion, and the worldwide problem of sex-selective abortion. *See* Exhibits B-H.

Further, even if *Casey*'s statements on pre-viability abortion constituted binding precedent on gestational-age restrictions or anti-discrimination provisions like Missouri's—which they do not—Plaintiffs misinterpret these statements. Critically, *Casey* stated that, "[b]efore viability, the

State's interests are not strong enough to support *a prohibition of abortion* or the imposition of a *substantial obstacle* to the woman's effective right to elect the procedure." *Casey*, 505 U.S. at 846. In other words, under *Casey*'s plain language, only a complete "prohibition" of pre-viability abortions (like that invalidated in *Roe v. Wade*) is *per se* unconstitutional. Other restrictions on abortion are subject to the "substantial obstacle" or "undue burden" test. *Id. Casey* emphasized that the State's interests in protecting unborn human life and promoting women's health still apply to pre-viability abortions: "the State has legitimate interests from *the outset of the pregnancy* in protecting the health of the women and the life of the fetus." *Id.* (emphasis added). *Casey* held only that a complete prohibition on pre-viability abortions—*i.e.*, one which completely removes the "ultimate decision to terminate her pregnancy," *id.* at 879—is *per se* invalid. Other restrictions are typically subject to the "undue burden" standard, which considers whether the law's "purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Id.* at 878.

Furthermore, Plaintiffs' interpretation of *Casey* is inconsistent with *Casey*'s holding, because *Casey* held that States *can* prohibit certain categories of pre-viability abortions—including minor abortions where the parents do not consent and judicial bypass is not granted. 505 U.S. at 899. Moreover, Plaintiffs' interpretation of *Casey* cannot be squared with the Supreme Court's later decision in *Gonzales v. Carhart*, 550 U.S. 124 (2007). In *Gonzales*, the Supreme Court again upheld a prohibition against another entire class of pre-viability abortions—*i.e.*, those performed using the gruesome D&X or "partial-birth" procedure. *Id.* at 135-38. *Gonzales* explicitly held that *Casey* "rejected . . . the interpretation of *Roe* that considered all previability regulations of abortion unwarranted." *Id.* at 146. *Gonzales* applied *Casey*'s undue-burden standard to this restriction, not the "*per se*" categorical rule urged by Plaintiffs. *Id.* at 150, 156. A gestational-age deadline by

which to seek an abortion, in the vast majority of cases, at most "has the incidental effect of making it more difficult or more expensive to procure an abortion," which "cannot be enough to invalidate it." *Casey*, 505 U.S. at 874 (quoted in *Gonzales*, 550 U.S. at 157-58).

In addition, Plaintiffs' theory that *Casey* and *Roe* create an *absolute* freedom to have a pre-viability abortion that cannot be restricted for any reason, if accepted, would lead to absurd results. "[E]ven fundamental rights of the Bill of Rights are not absolute." *Kovacs v. Cooper*, 336 U.S. 77, 85 (1949). All our most fundamental constitutional freedoms are subject to tailored restrictions for compelling governmental reasons. *See, e.g., Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 800-02 (2017); *Fisher v. University of Texas*, 136 S. Ct. 2198 (2016); *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656 (2015); *Johnson v. California*, 543 U.S. 499, 512-14 (2005); *Chaplinksy v. New Hampshire*, 315 U.S. 568, 571-72 (1942). On Plaintiffs' view, the "penumbral" right to pre-viability abortion is elevated above the Constitution's enumerated rights, which is "absurd." *PPINK*, 888 F.3d at 312 (Manion, J., concurring in the judgment). *Casey* sought to relax the strict scrutiny to which abortion regulations had previously been subject—yet Plaintiffs would make that standard *more* stringent for pre-viability abortions. *Id.*

Imposing a gestational-age deadline upon women seeking pre-viability abortions does not constitute a complete prohibition on such abortions, and does not deprive women of the "ultimate decision" whether to have an abortion. Rather, it merely requires them to make that "ultimate decision" sooner in pregnancy. In fact, the vast majority of women seeking pre-viability abortions in Missouri *already* comply with the 14-week, 18-week, and 20-week deadlines. *See infra* Part I.D. And many, if not all, of the others will be able to do so if required.

Finally, Plaintiffs have waived their ability to dispute the State's factual justifications for its restrictions by failing to address any questions regarding Missouri's justifications in their

opening brief. As noted above, the only argument that Plaintiffs raise on the merits is their claim that *any* restriction on pre-viability abortion is "*per se* unconstitutional." Doc. 3, at 9; *id.* at 9-11. Plaintiffs have been on notice since May 24, 2019, of Missouri's factual justifications for the restrictions in HB 126, because they are set forth in fifty detailed legislative findings in the bill itself. *See* HB 126, Ex. A, at 6-11; Mo. Rev. Stat. §§ 188.026.2(1)-(36), 188.026.5(1)-(8), 188.038.1(1)-(6). Yet Plaintiffs made the strategic decision not to address or dispute any of these justifications in their opening brief, or present any relevant evidence on these issues. Doc. 3, at 9-11. Under black-letter law, they are not permitted to reserve such evidence and arguments for their Reply brief, and the State would be unfairly prejudiced by permitting Plaintiffs to raise any such evidence for the first time in a reply brief—especially one filed one business day before the scheduled hearing. *See, e.g., MBI Energy Servs. v. Hoch*, 929 F.3d 506, 512 (8th Cir. 2019); *Tension Envelope Corp. v. JBM Envelope Co.*, 876 F.3d 1112, 1120 (8th Cir. 2017).

C. **Plaintiffs cannot assert any facial challenges to the provisions of HB 126 because they fail to satisfy the large-fraction test.**

Plaintiffs bring facial challenges to all provisions they challenge. *See* Doc. 1, at 26-27. But Plaintiffs present no evidence or argument to demonstrate that any of these provisions imposes a substantial obstacle to abortion access in a "large fraction" of cases where the provision is relevant. And the application of the "large fraction" test to gestational-age restrictions or anti-discrimination provisions was not addressed in any of the cases Plaintiffs cite. Doc. 3, at 9-11.

The Supreme Court in *Casey* identified two threshold elements for any undue-burden challenge: the challenged regulation must impose (1) a "substantial obstacle" to (2) a "large fraction" of women for whom the restriction is relevant. *See Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 894-95 (1992). To pursue a facial challenge, therefore, Plaintiffs must demonstrate that the challenged provision presents a substantial obstacle to abortion access in a

"large fraction" of cases where the provision is "relevant." *Planned Parenthood of Arkansas & E. Oklahoma v. Jegley*, 864 F.3d 953, 958 (8th Cir. 2017) (quoting *Casey*, 505 U.S. at 895).

Plaintiffs have not even attempted to make the requisite showing here, and any such showing would be impossible. As the General Assembly explicitly found in HB 126, a large percentage of abortions in Missouri occur before eight weeks' gestation, and the vast majority of abortions occur before fourteen weeks, eighteen weeks, and twenty weeks' gestation. *See* HB 126, Ex. A, at 12; Mo. Rev. Stat. § 188.026.2(35). These findings are unquestionably correct. Over the five-year period spanning from 2013 to 2017, 52.9 percent of abortions in Missouri were performed by 8 weeks' gestation, 89.3 percent were performed by 14 weeks' gestation, 92.7 percent were performed by 16 weeks' gestation, and 98.4 percent were performed by 20 weeks' gestation. *See* Declaration of Adam Crumbliss, ¶ 15 & Exs. 1-5 (attached as Exhibit B). In other words, less than half of abortions occurred after 8 weeks' gestation, about 10.7 percent occurred after 14 weeks' gestation, significantly less than 7.3 percent occurred after 18 weeks' gestation, and only a tiny fraction (1.6 percent) occurred after 20 weeks' gestation.

Moreover, these figures for Missouri are consistent with national figures reported by the Centers for Disease Control in 2015. "Among the 40 areas that reported gestational age at the time of abortion for 2015, approximately two thirds (65.4%) of abortions were performed by ≤8 weeks' gestation, and nearly all (91.1%) were performed at ≤13 weeks' gestation. Few abortions were performed at 14–20 weeks' gestation (7.6%) or at ≥21 weeks' gestation (1.3%)." Centers for Disease Control and Prevention, Tara C. Jatlaoui, MD, et al., *Abortion Surveillance – United States 2015*, *at* https://www.cdc.gov/mmwr/volumes/67/ss/ss6713a1.htm. Over the ten-year period from 2006 to 2015, "abortions performed at >13 weeks' gestation accounted for ≤9.0% of abortions," and there was a moderate trend toward abortions at earlier gestational ages. *Id.*

Plaintiffs concede that "[t]he vast majority of women who seek abortion care in Missouri (as in the nation as a whole) do so in the first trimester of pregnancy, when the pregnancy is at or less than 14 weeks LMP," Doc. 1, ¶ 51; and that "in 2016 to 2018, 82% of abortions at RHS were performed in the first trimester," and that 14 percent of their patients obtained abortions "at or after 14 weeks LMP, 5% at or after 18 weeks LMP, and 2.6% at or after 20 weeks LMP." *Id.*

None of these fractions constitutes a "large fraction" under *Casey* and *Jegley*. The Fifth Circuit recently held that 30 percent is not a "large fraction." *June Med. Servs. LLC v. Gee*, 905 F.3d 787, 814-15 (5th Cir. 2018). The Fifth Circuit had already held that 17 percent is "nowhere near a 'large fraction.'" *Whole Women's Health v. Lakey*, 769 F.3d 285, 298 (5th Cir. 2014). The Eighth Circuit stated in *Jegley* that 12 percent is not a "large fraction." *Planned Parenthood of Arkansas & E. Oklahoma v. Jegley*, 864 F.3d 953, 959 n.8 (8th Cir. 2017). Both the Eighth Circuit and the Fifth Circuit cited with approval the Sixth Circuit case also holding that 12 percent is not a "large fraction." *Cincinnati Women's Services, Inc. v. Taft*, 468 F.3d 361, 374 (6th Cir. 2006). All these fractions explicitly held to be *not* "large," are larger than the fraction of women affected by Missouri's 14-week, 18-week, and 20-week restrictions.

Moreover, the Sixth Circuit holds that a "large fraction" must be substantially close to 100 percent—*i.e.*, "practically all of the affected women." *Taft*, 468 F.3d at 373. The Fifth Circuit, likewise, has held that a "large fraction" must comprise the "vast majority" of women affected by the regulation. *Planned Parenthood of Greater Texas Surgical Health Services v. Abbott*, 748 F.3d 583, 600 (5th Cir. 2014). The Supreme Court's cases directly support this interpretation of the "large fraction" test. Outside of the abortion context, the general rule for facial challenges is that 100 percent of the challenged statute's applications must be invalid. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008); *United States v. Salerno*, 481 U.S.

739, 745 (1987). In adopting the "large fraction" test in *Casey*, the Supreme Court relaxed the *Salerno* standard somewhat, but did not abolish it entirely. *See June Medical*, 905 F.3d at 815. For this reason, the Supreme Court has explicitly stated that the "large fraction" test is more exacting, and thus requires a larger fraction, than the "substantial overbreadth" test of the First Amendment, which requires more than 50 percent. *Gonzales v. Carhart*, 550 U.S. 124, 167 (2007).

The Supreme Court's unanimous opinion in *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320 (2006), also supports this interpretation. *Ayotte* reversed the facial invalidation of a regulation that was potentially invalid in only a "small percentage of cases." *Id.* at 328. *Ayotte* re-emphasized that "the 'normal rule' is that 'partial, rather than facial, invalidation is the required course.'" *Id.* at 329 (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)). Where "only a few applications of [the] statute would present a constitutional problem," *id.* at 331, the court should not apply the "blunt remedy" of facial invalidation. *Id.* at 321.

Finally, the Supreme Court's expressed preference for as-applied challenges brought by individual patients also supports the rigorous application of the large-fraction test. "It is neither our obligation nor within our traditional institutional role to resolve questions of constitutionality with respect to each potential situation that might develop." *Gonzales*, 550 U.S. at 168. "It would indeed be undesirable for this Court to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation." *Id.* (quoting *United States v. Raines*, 362 U.S. 17, 21 (1960)). In the abortion context, as elsewhere, "[a]s-applied challenges are the basic building blocks of constitutional adjudication." *Id.* (quoting Richard H. Fallon, *As-Applied and Facial Challenges and Third-Party Standing*, 113 HARV. L. REV. 1321, 1328 (2000)). Here, "the Act is open to a proper as-applied challenge in a discrete case." *Id.*

Plaintiffs may argue that each restriction satisfies the "large fraction" test because, on their view, the proper denominator of the "fraction" comprises women seeking abortions only *after* they have passed each gestational benchmark. If so, this argument will be meritless for at least two reasons. First, as both the Supreme Court and Eighth Circuit have made clear, the denominator is all women for whom the restriction is "relevant." *Jegley*, 864 F.3d at 958; *Casey*, 505 U.S. at 895; *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2320 (2016). A gestational age deadline constitutes a "relevant" regulation for women seeking abortion at earlier gestational ages. "Relevant" means "bearing upon or properly applying to the matter at hand . . . pertinent." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1917 (1986). Such a deadline "bears upon" the decision of women who may seek an abortion, because it affects their timing and thus must be taken into account. Plaintiffs, in fact, repeatedly concede (and emphasize) the *relevance* of the Gestational Age Restrictions for all women seeking abortion. Doc. 1, ¶¶ 55-61. Thus, the proper denominator is "pregnant women in Missouri who are seeking an abortion while not experiencing a medical emergency." HB 126, Ex. A, at 12; Mo. Rev. Stat. § 188.026.2(35).

In addition, this argument would deprive the large-fraction test of any meaningful application. On this view, an abortion restriction would "relevant" under *Casey* only if it actually prevented the woman from obtaining an abortion. But this would mean that the fraction would 100 percent in every case where the large-fraction test was applied. This logic renders the large-fraction test meaningless. *See Hellerstedt*, 136 S. Ct. at 2343 n.11 (Alito, J., dissenting).

D. **The Gestational-Age Restrictions Are Valid Under *Casey*.**

Plaintiffs are unlikely to succeed in their challenges to the Gestational-Age Restrictions because those restrictions are valid under *Casey*'s undue-burden standard or any other applicable standard of review. In reviewing pre-viability abortion regulations under *Casey*, courts "consider the burdens a law imposes on abortion access together with the benefits those laws confer."

*Hellerstedt*, 126 S. Ct. at 2309.  Here, the benefits of each Gestational-Age Restriction decisively outweigh the burdens on abortion access from each restriction.  *See id.*

1. **The Gestational-Age Restrictions advance critical state interests that become increasingly compelling as gestational age advances.**

The Gestational-Age Restrictions advance several compelling state interests that the Supreme Court has recognized as valid bases to regulate pre-viability abortions.  Moreover, the State's justification for each restriction becomes increasingly compelling as gestational age advances into the second trimester, resulting in an overwhelming justification.

*First*, the Gestational Age Restrictions advance the State's legitimate interest in protecting the life of the unborn child.  *Casey* recognized that "the State has legitimate interests from the outset of the pregnancy in protecting . . . the life of the fetus."  *Casey*, 505 U.S. at 846.  Missouri has a profound and longstanding tradition of recognizing the humanity of unborn children.  HB 126, Ex. A, at 6; Mo. Rev. Stat. § 188.026.2(2); Mo. Rev. Stat. §§ 1.205.1(1)-(2), 1.205.2, 188.010.

The Gestational Age Restrictions advance this legitimate interest.  They reflect Missouri's recognition that, as a matter of scientific fact, the unborn child possesses the characteristics that the State treats as indicative of human life worthy of legal protection in every other context.  "[U]nborn children have all the qualities and attributes of adult human persons differing only in age or maturity.  Medically, human life is a continuum from conception to death."  HB 126, Ex. A, at 7; Mo. Rev. Stat. § 188.026.2(4) (quoting *Rodgers v. Danforth*, 486 S.W.2d 258, 259 (Mo. banc 1972)).  The General Assembly found that a detectable heartbeat is present by eight weeks' gestation, and that "the presence of a heartbeat in an unborn child represents a more definable point of ascertaining survivability than the ambiguous concept of viability."  HB 126, Ex. A, at 8; Mo. Rev. Stat. § 188.026.2(13).  The legislature also found that respiratory, circulatory, and brain-wave activity have also commenced by eight weeks' gestation, and "Missouri law identifies the presence

18

of circulation, respiration, and brain function as indicia of life under section 194.005," indicating that a person possessing them is "legally alive." *Id.* at 9; Mo. Rev. Stat. § 188.026.2(14)-(16). This justification becomes increasingly compelling at later gestational ages, as the developing fetus's brain activity and other functions advance. *See* Declaration of Dr. Maureen Condic, ¶¶ 8-48 (attached as Exhibit C); Declaration of Dr. Kathi Aultman, ¶¶ 10-83 (attached as Exhibit D).

*Second*, the Gestational Age Restrictions advance the State's compelling interest in promoting respect for innocent human life in general. *Gonzales* explicitly recognized that the State has a legitimate interest in promoting "respect for the dignity of human life." *Gonzales*, 550 U.S. at 157. *Gonzales* quoted with approval the U.S. Congress's findings with respect to the federal Partial-Birth Abortion Act: "Implicitly approving such a brutal and inhumane procedure by choosing not to prohibit it will further coarsen society to the humanity of not only newborns, but all vulnerable and innocent human life, making it increasingly difficult to protect such life." *Gonzales*, 550 U.S. at 157 (quoting Congressional Findings ¶ (14)(N)). Missouri, likewise, has found that the Gestational Age Restrictions will benefit "society, by fostering respect for human life, born and unborn, at all stages of development, and by lessening societal tolerance of violence against innocent human life." HB 126, Ex. A, at 12; Mo. Rev. Stat. § 188.026.2(35)(d).

Unfettered access to abortion has "coarsen[ed] society to the humanity of . . . newborns" in many States, thus "making it increasingly difficult to protect . . . all vulnerable and innocent human life." *Gonzales*, 550 U.S. at 157 (quoting Congressional Findings ¶ (14)(N)).[1] Again, as

_____

[1] Recent events confirm the validity of this concern. There have been increasingly public calls for unrestricted third-trimester abortion up to the point of birth—and even calls for legalizing infanticide—in States whose legal and political cultures (unlike Missouri) have embraced Plaintiffs' expansive view of abortion rights. *See, e.g.,* Devan Cole, *Virginia Governor Faces Backlash Over Comments Supporting Late-Term Abortion Bill*, CNN.com (Jan. 31, 2019), *at* https://www.cnn.com/2019/01/31/politics/ralph-northam-third-trimester-abortion/index.html.

*Gonzales* recognized, this interest in promoting respect for human life becomes increasingly compelling at later gestational ages, as the developing fetus closely resembles a newborn baby, and the predominant method of abortion at fourteen weeks' gestation and later entails ripping the living fetus limb from limb. *See id.*; *see also* Aultman Decl. ¶¶ 105-07. "Respect for human life finds an ultimate expression in the bond of love the mother has for her child. [HB 126] recognizes this reality as well." *Gonzales*, 550 U.S. at 159.

*Third*, the Gestational Age Restrictions protect both the internal integrity and the public reputation of the medical profession as healers rather than killers. In HB 126, Missouri found that the restrictions benefit "the medical profession, by preserving its integrity and fulfilling its commitment to do no harm." HB 126, Ex. A, at 12; Mo. Rev. Stat. § 188.026.2(35)(c). The Supreme Court recognized the validity of this interest in *Gonzales*: "There can be no doubt the government 'has an interest in protecting the integrity and ethics of the medical profession.'" *Gonzales*, 550 U.S. at 157 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997)). In enacting the Partial-Birth Abortion Act, "Congress was concerned . . . with the effects on the medical community and on its reputation caused by the practice of partial-birth abortion." *Id.* "The findings in the Act explain: 'Partial-birth abortion . . . confuses the medical, legal, and ethical duties of physicians to preserve and promote life, as the physician acts directly against the physical life of a child, whom he or she had just delivered, all but the head, out of the womb, in order to end that life." *Id.* (quoting Congressional Findings ¶ (14)(J)).

Missouri's restrictions advance the same interest, especially for abortions performed after fourteen weeks' gestation, when the principal method of abortion in Missouri is the "brutal" method of D&E. *Gonzales*, 550 U.S. at 129. D&E involves "the dismemberment, disarticulation, and exsanguination of the unborn child, causing the unborn child's death." HB 126, Ex. A, at 10;

Mo. Rev. Stat. § 188.026.2(24). Permitting the medical profession to become involved in intentionally killing the innocent at any stage of development, and in such brutal tactics of destroying innocent human life as D&E, profoundly contradicts the millenia-old traditional role of physicians as healers, which goes back to the Hippocratic Oath. *See* Declaration of Dr. Farr Curlin, ¶¶ 43-53 (attached as Exhibit E). The Gestational Age Restrictions counteract the ongoing subversion of the traditional role of physicians as healers, which can have devastating consequences for both the medical profession and society as a whole. *Id.*

*Fourth*, the Gestational Age Restrictions advance Missouri's compelling interest in protecting and promoting the physical and psychological health of women. Again, *Casey* held that "the State has legitimate interests from the outset of the pregnancy in protecting the health of the women." *Casey*, 505 U.S. at 846. As the Supreme Court recognized in *Gonzales*, this interest includes protection for women's psychological well-being as well as physical health: "Whether to have an abortion requires a difficult and painful moral decision. . . . [I]t seems unexceptionable to conclude some women come to regret their choice to abort the infant life they once created and sustained. Severe depression and loss of esteem can follow." *Gonzales*, 550 U.S. at 159 (citations omitted). Empirical evidence decisively confirms that abortion at any stage of development involves serious risks of grave physical and psychological harms. *See* Declaration of Dr. Priscilla Coleman, ¶¶ 9-19, 45-74 (attached as Exhibit F). As the Missouri General Assembly found, these risks increase "exponentially" at later gestational ages, so that the risk of death from abortion is 75 times higher after 20 weeks' gestation than at eight weeks' gestation, almost 30 times higher at 18 weeks' gestation, at 15 times higher at 14 weeks' gestation. HB 126, Ex. A, at 11; Mo. Rev. Stat. § 188.026.2(33)(a)-(d). Again, strong evidence supports these findings. *See* Coleman Decl. ¶¶ 20-33; J. Diedrich, et al., *Complications of Surgical Abortion*, 52 CLINICAL OBSTET. AND GYN. 205

(June 2009) (reporting that "the risk of complications" from abortion "increases exponentially with gestational age"). Moreover, to the extent that Plaintiffs may claim that there are disputes about the physical and psychological risks of abortion at various gestational stages, "[t]he Court has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *Gonzales*, 550 U.S. at 163.

*Fifth*, the State of Missouri has a compelling interest in preventing abortions that inflict unimaginable pain on unborn children who are likely capable of experiencing pain. As noted above, the General Assembly made detailed factual findings about the development of the unborn child's pain receptivity and capability to experience pain, including detailed scientific findings regarding the neurophysical basis of pain-capability between 14 weeks and 20 weeks' gestation. HB 126, Ex. A, at 9; Mo. Rev. Stat. § 188.026.2(17)-(23). These findings rest on indisputable scientific fact. The neurophysical apparatus for experiencing pain develop in unborn children starting around fourteen weeks' gestation, and they are typically fully developed by 20 weeks' gestation. Condic Decl. ¶¶ 7, 20-21. Outside the abortion context, fetal anesthesia is recommended for second-trimester fetuses, to address the concern that the fetus experiences pain during the operation. Condic Decl. ¶¶ 40-44. Moreover, the "predominant method" of abortion after 14 weeks' gestation in Missouri "includes the dismemberment, disarticulation, and exsanguination" of the living unborn child. HB 126, Ex. A, at 10; Mo. Rev. Stat. § 188.026.2(24). For a living fetus capable of experiencing pain, this method of abortion inflicts horrible pain that Missouri would not tolerate if it were inflicted on a frog or lizard, much less a human being. *Id.* at 11; Mo. Rev. Stat. § 188.026.2(29)(b) (citing Mo. Rev. Stat. Chapters 273, 578).

*Sixth*, Missouri's restrictions on abortions in the second trimester (the 14-week, 18-week, and 20-week restrictions) draw further support from an emerging global consensus against those

practices as barbaric and offensive to human rights. In HB 126, the General Assembly recognized that the Supreme Court has stated that the U.S. Constitution typically does not protect practices that are viewed as "brutal and painful" or "disgusting" in "the overwhelming weight of international opinion." HB 126, Ex. A, at 10-11; Mo. Rev. Stat. § 188.026.2(27)-(32) (citing *Roper v. Simmons*, 543 U.S. 551, 578 (2005), and *Bucklew v. Precythe*, 139 S. Ct. 1112, 1123 (2019)). The General Assembly further found that "the opinion of the world community, reflected in the laws of the United Nation's 193-member states and six other entities, is that in most countries, most abortions are prohibited after twelve weeks of gestational age or later." HB 126, Ex. A, at 11; Mo. Rev. Stat. § 188.026.2(31). The General Assembly also found that "[t]he opinion of the world community is also shared by most Americans, who believe that most abortions in the second and third trimesters of pregnancy should be illegal, based on polling that has remained consistent since 1996." *Id.*; Mo. Rev. Stat. § 188.026.2(32).

These findings are indisputable. The global consensus is that second-trimester abortions should be severely restricted, reflecting a profound discomfort with the practice. Declaration of Dr. Justin Dyer, ¶¶ 9-14 & tbl. 1 (attached as Exhibit G). This is especially true of later second-trimester abortions, such as those after 18 weeks' or 20 weeks' gestation, which are permitted in only a tiny minority of the world's nations. Dyer Decl. ¶ 12. Because fetuses at this stage of development are evidently capable of experiencing pain, Condic Decl. ¶¶ 8-48, Missouri currently permits dozens or hundreds of abortions each year that inflict horrific pain on the unborn child that neither the U.S. Constitution nor Missouri law would tolerate if inflicted on convicted murderers or even animals. HB 126, Ex. A, at 11; Mo. Rev. Stat. § 188.026.2(28), (29)(a)-(b) (citing Mo. Rev. Stat. Chapters 273, 578).

*Seventh*, the 20-week ban is independently valid because, under contemporary medical advances, it closely approximates a prohibition of abortion at the point of viability. Fetuses born at 19 weeks of fetal age (just after 20 weeks LMP) are now capable of survival. Condic Decl. ¶ 20. The tendency of abortion providers to place viability around 23-24 weeks reflects a persistent bias against treatment for premature fetuses using current medical technology. Curlin Decl. ¶ 23. Modern medicine has extended viability outside the womb to just after 20 weeks' gestation.

2. **The Gestational Age Restrictions Impose Minimal Cognizable Burdens on Women Seeking Abortions in Missouri.**

As discussed above, *supra* Part I.D, the practical import of the Gestational Age Restrictions is not to prohibit pre-viability abortions, but to require women seeking abortions to do so by a particular gestational-age deadline. In other words, the Restrictions compel an earlier abortion decision, but they do not remove the "ultimate decision" from the woman. *Casey*, 505 U.S. at 879.

The cognizable burdens imposed by such restrictions are minimal, and they become vanishingly small for almost all women at later gestational ages, such as 18 weeks and 20 weeks. Critically, a large percentage of women seeking abortions in Missouri already do so by eight weeks' gestation, and vast majorities of women who obtain abortions in Missouri do so by the 14-week, 18-week, and 20-week deadlines. *Supra*, Part I.C. Thus, the Gestational Age Restrictions impose no burden at all on most women seeking abortions in Missouri, who already comply with them, and the second-trimester restrictions impose no burden on the vast majority of women. *Id.*

Moreover, the Gestational Age Restrictions also impose no significant burden on a significant subset of the women who currently do not comply with them, because many of those women undoubtedly could comply with them without unduly burdensome additional effort. For example, a significant number of women who currently obtain abortions at 14 weeks, 15 weeks, 16 weeks, and 17 weeks' gestation undoubtedly could do so with minimal additional difficulty

before 14 weeks' gestation. Again, this is especially true of women obtaining abortions after the latest gestational benchmarks, such as 18 weeks and 20 weeks.

Finally, to the extent that there are any women who may have a claim, based on their unique circumstances, that any particular Gestational-Age Restriction would constitute a "substantial obstacle" to their decision to have a pre-viability abortion, these challenges should be addressed through a specific as-applied challenge brought by an individual patient. As the Supreme Court held in *Gonzales*: "It is neither our obligation nor within our traditional institutional role to resolve questions of constitutionality with respect to each potential situation that might develop. It would indeed be undesirable for this Court to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation. For this reason, as-applied challenges are the basic building blocks of constitutional adjudication." *Gonzales*, 550 U.S. at 168 (citations, quotation marks, and alterations omitted). "The Act is open to a proper as-applied challenge in a discrete case." *Id.* Burdens from which relief would be readily available through a proper as-applied challenge should not be considered as part of the "undue burden" calculus.

E. **The Anti-Discrimination Law Satisfies Strict Scrutiny or Any Other Level of Constitutional Scrutiny.**

Similarly, Plaintiffs are unlikely to succeed in their challenge to the Anti-Discrimination Law, Mo. Rev. Stat. § 188.038, because the law is narrowly tailored to advance compelling state interests, and so it survives strict scrutiny or any other level of constitutional scrutiny.

As discussed above, Plaintiffs' argument that *Casey* renders the Anti-Discrimination Law *per se* invalid has no merit: "None of the Court's abortion decisions holds that states are powerless to prevent abortions designed to choose the sex, race, and other attributes of children." *PPINK*, 917 F.3d 532, 536 (Easterbrook, J., dissenting from the denial of rehearing en banc).

1. **Missouri has compelling interests in eradicating historical discrimination and preventing abortions targeted at persons with Down Syndrome.**

First, Missouri has a compelling interest in eradicating historical discrimination against persons with Down Syndrome and preventing abortions for the purpose of eliminating persons with Down Syndrome. Eradicating invidious discrimination that targets certain classes of people for elimination based on immutable characteristics is a paradigmatic compelling state interest. The Supreme Court has recognized that the States have a "compelling interest in eliminating discrimination against women" that justifies restrictions on First Amendment freedoms. *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984). The Supreme Court has held that both Congress and the States may prohibit the "moral and social wrong" of discrimination by private parties in public accommodations and other areas. *Heart of Atlanta Motel v. United States*, 379 U.S. 241, 257 (1964); *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983). Eliminating invidious discrimination against the disabled is also a critical state interest. *See* 42 U.S.C. § 12132; 29 U.S.C. § 794. Preventing private discrimination based on sex, race, and disability is a "compelling" state interest. *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 n.5 (1988).

Missouri has exceptionally strong interests in eradicating historical discrimination against persons with Down Syndrome and protecting them from being selected for abortion based on that immutable characteristic. HB 126, Ex. A, at 23-24; Mo. Rev. Stat. § 188.038.1(1), (3), (6). The history of such discrimination against persons with Down Syndrome, especially within the medical community, is both shocking and shockingly recent. Declaration of Dr. Martin McCaffrey, ¶¶ 12-20 (attached as Exhibit H). Only a few decades ago, institutionalization, marginalization, abuse, and neglect of persons with Down Syndrome were the norm and were widely accepted within the

medical community. *Id.* Due to institutionalization and neglect, persons with Down Syndrome had a life expectancy of 10 years only a few decades ago, while their life expectancy with ordinary medical care is 47 years. *Id.* ¶ 12. As recently as 1982, a prominent medical practitioner described children with Down Syndrome as "mere blobs" in court testimony in the Baby Doe case. *Id.* ¶ 19.

Since the 1990s, our society has eliminated many of these treatment disparities after birth, but the eugenic attitude and the discrimination against persons against Down Syndrome has transferred to abortion decisions made before birth. *Id.* ¶¶ 21-27. Abundant literature attests to the positive outcomes and high quality of life of persons with Down Syndrome and their families. *Id.* ¶ 27, 51; Coleman Decl. ¶¶ 100-03. Yet counseling of parents expecting children who may have Down Syndrome continues to reflect the medical community's powerful bias against persons with Down Syndrome. McCaffrey Decl. ¶¶ 28-42. As a result, parents in the United States and other Western nations are choosing to abort children with Down Syndrome in overwhelming numbers. One meta-study estimates that 61 to 93 percent of parents in the United States who learn that their child will be born with Down Syndrome have an abortion. Jamie L. Natoli et al., *Prenatal Diagnosis of Down Syndrome: A Systematic Review of Termination Rates (1995–2011)*, 32 PRENATAL DIAGNOSIS 142 (2012) (reviewing U.S. studies). Other evidence confirms that the rate of abortion for children suspected of Down Syndrome in the United States is extremely high, with a devastating impact on the community. McCaffrey Decl. ¶¶ 48, 50. The emergence of technologies that screen and detect for the possibility of Down Syndrome earlier in pregnancy exacerbates this problem. *Id.* ¶ 22, 24.

This institutionalized bias threatens to eliminate the entire class of persons with Down Syndrome: "[S]ome countries are now celebrating the 'eradication' of Down syndrome through abortion. That not only devalues the lives of those living with Down syndrome, but it

disincentivizes research that might help them in the future." *PPINK*, 888 F.3d at 315 (Manion, J., concurring in the judgment). "Permitting women who otherwise want to bear a child to choose abortion because the child has Down syndrome perpetuates the odious view that some lives are worth more than others and increases the 'stigma associated with having a genetic disorder.'" *Id.* (quoting Peter A. Benn & Audrey R. Chapman, *Practical and Ethical Considerations of Noninvasive Prenatal Diagnosis*, 301 J. AM. MED. ASS'N 2154, 2155 (2009)).

> ## 2. Missouri has compelling interests in preventing sex-selective and race-selective abortions.

Similarly, Missouri has compelling interests in preventing and eliminating abortions targeted at persons solely because of their sex or race. HB 126, Ex. A, at 23-24; Mo. Rev. Stat. § 188.038.1(2)-(5). The worldwide problems of sex-selective abortions are widely known and well documented. Asia has over 100 to 160 million "missing" women from sex-selective abortions. Mara Hvistendahl, *Unnatural Selection: Choosing Boys over Girls, and the Consequences of a World Full of Men* 5-12 (2011). In India, "[o]ver the course of several decades, 300,000 to 700,000 female fetuses were selectively aborted each year." Sital Kalantry, *How to Fix India's Sex-Selection Problem*, N.Y. TIMES (Jul. 27, 2017); *see also* Nicholas Eberstadt, *The Global War Against Baby Girls*, THE NEW ATLANTIS (2011). Sex-selective abortion "is a symptom of the pervasive social, cultural, political and economic injustices against women, and a manifest violation of women's human rights." *Sex Imbalances at Birth: Current Trends, Consequences, and Policy Implications*, U.N. Population Fund Asia & Pacific Regional Office (Aug. 2012).

There is an emerging awareness of the problems of sex-selective abortions in the United States as well. First, evidence indicates that sex-selective abortions remain extremely common among immigrant and ethnic groups from nations where sex-selective abortions are widely practiced. "[A]s birth order rises, apparently so does selection—at least, in certain ethnic groups.

With 2000 U.S. Census data, researchers investigating Korean, Chinese, and Indian communities found that, after having one girl, parents have as many as 1.17 boys per girl when their next child is born. With two girls at home, the ratio goes up to 1.51 boys per girl for the third child (meaning 151 boys are born for each 100 girls)." Sujatha Jesudason et al., *Sex Selection in America: Why It Persists and How We Can Change It*, THE ATLANTIC (May 31, 2012), *at* https://www.theatlantic.com/politics/archive/2012/05/sex-selection-in-america-why-it-persists-and-how-we-can-change-it/257864/.

Sex selection of human embryos at the pre-implantation stage during IVF is already widespread in the United States, practiced under the euphemism "family balancing." *See, e.g.,* Gender Selection, *New Hope Fertility Clinic*, New York, NY, *at* https://www.newhopefertility.com/gender-selection/ ("You will have the ability to select the gender of your baby now and in the future!"); Boy or Girl?, *The Genetics and IVF Institute*, Fairfax, VA, *at* https://www.givf.com/familybalancing/; Family Balancing, Boston IVF, Beth Israel Deaconess Medical School, Boston, MA, *at* https://www.bostonivf.com/treatments/Family-Balancing/ (typical online advertisements for "family balancing" through sex selection). Sex-selective abortion is another technique for such "family balancing." *See, e.g.,* Harry J. Lieman, M.D., et al., *Sex Selection for Family Balancing*, AMA JOURNAL OF ETHICS (2014), *available at* https://journalofethics.ama-assn.org/article/sex-selection-family-balancing/2014-10 (describing sex-selective abortion as "the most extreme form of sex selection").

In 2017, the Ethics Committee of the American College of Obstetricians and Gynecologists issued a Committee Opinion rejecting sex selection of offspring for personal reasons: "[T]he committee opposes meeting requests for sex selection for personal and family reasons, including family balancing, because of the concern that such requests may ultimately support sexist

practices." Am. Coll. of Obstetricians and Gynecologists, *ACOG Committee Opinion No. 360: Sex Selection*, at 1, 4 (Feb. 2007), *available at* http://www.lb7.uscourts.gov/documents/17-31634.pdf. "The committee shares the concern expressed by the United Nations and the International Federation of Gynecology and Obstetrics that sex selection can be motivated by and reinforce the devaluation of women." *Id.* at 3. The Committee noted that patients may request "aborting fetuses that are not of the desired sex" in the interest of "family balancing," and concluded that this practice "raises ethical concerns," because "even when sex selection is requested for nonsexist reasons, the very idea of preferring a child of a particular sex may be interpreted as condoning sexist values and, hence, create a climate in which sex discrimination may more readily flourish." *Id.* at 3. "Misconception about the accuracy of this evolving technology coupled with a strong preference for a child of a particular sex may lead couples to terminate a pregnancy of the 'undesired' sex." *Id.* at 3. "In most societies where sex selection is widely practiced, families prefer male offspring." *Id.* at 3.

But there is widespread disregard for ACOG's guidance on this point in the medical community, and there is every reason to believe that sex-selective abortions are common. "[A]s of 2006, half of American fertility clinics that offer embryo screening allow would-be parents some form of sex-selective add-ons . . . and the market is growing." Jesudason et al., *Sex Selection in America*, *supra*. "These clinics advertise their sex-selective wares heavily in ethnic language media and enclaves where Asian Americans reside." *Id.* "Today, Americans can learn -- and thus select for sex -- as early as seven weeks into a pregnancy, using a non-invasive blood test making big news in popular and obstetric circles. . . [T]his product enters a market where some parents-to-be pine not just for any healthy baby; some want what they see as a particular kind." *Id.* Missouri has a compelling interest in eradicating this form of invidious sex-based discrimination.

Missouri has a similarly compelling interest in eradicating race-based invidious discrimination in the abortion decision. The historical linkage between the movement for abortion rights and the race-based eugenics movement in America is strong and well-documented. *See, e.g., Box*, 139 S. Ct. at 1783-92 (Thomas, J., concurring in the denial of certiorari). "Eight decades after [Margaret] Sanger's 'Negro Project,' abortion in the United States is also marked by a considerable racial disparity." *Id.* at 1791. "The reported nationwide abortion ratio— the number of abortions per 1,000 live births—among black women is nearly 3.5 times the ratio for white women." *Id.* (citing Dept. of Health and Human Services, Centers for Disease Control and Prevention, T. Jatlaoui et al., *Abortion Surveillance—United States, 2015*, 67 Morbidity and Mortality Weekly Report, Surveillance Summaries, No. SS–13, p. 35 (Nov. 23, 2018) (Table 13)). As Missouri's General Assembly found, similar racial disparities afflict Missouri's abortion rates: "Among Missouri residents, the rate of black or African-American women who undergo abortions is significantly higher, about three and a half times higher, than the rate of white women who undergo abortions." HB 126, Ex. A, at 24; Mo. Rev. Stat. § 188.038.1(4). Plaintiffs concede that there is a massive disproportion in Missouri in the provision of abortion along racial lines, alleging that "the majority of abortion patients in Missouri are women of color." Doc. 1, ¶ 74. "Whatever the reasons for these disparities, they suggest that, insofar as abortion is viewed as a method of 'family planning,' black people do indeed 'take the brunt of the 'planning.''" *Box*, 139 S. Ct. at 1791 (Thomas, J., concurring in the denial of certiorari) (citation and alteration omitted).[2]

---

[2] The Court also requested counsel to address this question with respect to the Anti-Discrimination Law: "Although apparently not included in existing legislation, would not an even larger disfavored class in the abortion context likely be potentially illegitimate pre-viable fetuses of unmarried women and girls?" The State respectfully submits that, under current law, the assessment whether a state has a compelling state interest in preventing the targeting of illegitimate children (or children with any other immutable characteristic) for abortion would call for a careful inquiry into the asserted interest—including a historical and current inquiry into whether

### 3. The Anti-Discrimination Law is narrowly tailored to advance Missouri's interests.

The Anti-Discrimination Law is narrowly tailored to advance Missouri's compelling interests in eradicating historical discrimination based on sex, race, and Down Syndrome, and preventing abortions that target persons for elimination based on these immutable characteristics. Both provisions of the Anti-Discrimination Law prohibit abortions "solely" on the basis of those immutable characteristics, to prevent a restriction on abortions for non-discriminatory reasons. HB 126, Ex. A, at 24; Mo. Rev. Stat. § 188.038.2, .3. The law provides that "[n]o person shall perform or induce an abortion on a woman if the person knows that the woman is seeking an abortion *solely* because of a prenatal diagnosis, test, or screening indicating Down Syndrome or the potential of Down Syndrome in an unborn child," *id.*, and that "[n]o person shall perform or induce an abortion on a woman if the person knows that the woman is seeking the abortion *solely* because of the sex or race of the unborn child. *Id.* (emphasis added). The law also requires the abortion provider to have knowledge of the discriminatory purpose. *Id.*

These limitations on the law's prohibitions render it narrowly tailored to advance Missouri's interests. As Judge Manion stated with respect to Indiana's similar law, "it is hard to imagine legislation more narrowly tailored to promote this interest than the nondiscrimination provisions." *PPINK*, 888 F.3d at 316 (Manion, J., concurring). "The challenged sections only prohibit abortions performed solely because of the race, sex, or disability of the unborn child. The doctor also must know that the woman has sought the abortion solely for that purpose." *Id.* "These are provisions that apply only to very specific situations and carefully avoid targeting the purported

protection of the asserted suspect class presents a compelling need, whether the suspect class has faced historical and current invidious discrimination in this context, and whether the restriction is properly tailored to advance the state's interest. For the reasons stated above, none of these questions is close in this case.

general right to pre-viability abortion." *Id.* "They will not affect the vast majority of women who choose to have an abortion without considering the characteristics of the child. Indeed, they will not even affect women who consider the protected characteristics along with other considerations." *Id.* "If it is at all possible to narrowly tailor abortion regulations, [Missouri] has done so." *Id.*

Because the Anti-Discrimination Law satisfies strict scrutiny, which is the most rigorous and exacting form of constitutional scrutiny, *a fortiori* they satisfy any less rigorous form of scrutiny, including *Casey*'s undue-burden test.[3]

F. **Every provision and individual application of HB 126 is severable.**

Every provision and individual application of HB 126 is severable, so that if any provision or individual application is held invalid, every other provision and application should stand.

Courts prefer "to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact." *Ayotte*, 546 U.S. at 328-29 (citation omitted). This rule applies with even greater force here where the statute contains a severability clause. *Id.* at 331.

Federal courts must follow state severability law. *Leavitt v. Jane L.*, 518 U.S. 137, 138-39 (1996) (holding that "[s]everability is of course a matter of state law," and so the Tenth Circuit

---

[3] The State acknowledges that only the Supreme Court can overrule its precedents, and they remain binding on lower courts until they are overruled. But if any court concludes that any provision of HB 126 is invalid under *Roe*, *Casey*, or any other decision—which it should not—the State of Missouri respectfully submits that those decisions were wrongly decided and should be overruled. As many have observed, *Roe* rested on a theory of constitutional interpretation (relying on "emanation" and "penumbra") that has been thoroughly discredited, and its errors included misunderstandings in the areas of science, *see* Aultman Decl. ¶¶ 10-83, 91-104; jurisprudential history, *see* Dyer Decl. ¶¶ 15-31; and ethics, *see* Curlin Decl. ¶¶ 10-29. Likewise, *Casey*'s reaffirmation of the "central holding" in *Roe* focused on the unstable and self-contradictory "viability" standard, which many have observed "is clearly on a collision course with itself." *Edwards*, 786 F.3d at 1118 (quoting *City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 458 (1983) (O'Connor, J., dissenting)). *Roe* and *Casey* have not generated a settled body of jurisprudence, but have instead engendered ongoing constitutional and political controversy. *See Casey*, 505 U.S. at 995-96 (Scalia, J., concurring in the judgment in part and dissenting in part).

should have enforced a state abortion statute's "explicit[] stat[ement]" of severability); *Dorchy v. Kansas*, 264 U.S. 286, 290 (1924). This rule reflects and follows the general practice of trying "to limit the solution to the problem." *Ayotte*, 546 U.S. at 328. Courts "try not to nullify more of a legislature's work than is necessary," because a "'ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'" *Id.* Mindful of their limited "constitutional mandate and institutional competence," courts enforce severability clauses because "the touchstone for any decision about remedy is legislative intent." *Ayotte*, 546 U.S. at 321, 330-31.

Under this framework, the Supreme Court has long enforced severability clauses that sever not only the statutory provisions, but also the applications of those provisions to each individual and circumstance. *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501 & n.14 (1985); *Wyoming v. Oklahoma*, 502 U.S. 437, 460-61 (1992).

Under Section 188.018, as well as under identical clauses repeated through HB 126 for the avoidance of doubt, each provision and application is severable:

> If any one or more provisions, sections, subsections, sentences, clauses, phrases, or words of this chapter or the application thereof to any person, circumstance, or period of gestational age is found to be unenforceable, unconstitutional, or invalid by a court of competent jurisdiction, the same is hereby declared to be severable and the balance of this chapter shall remain effective notwithstanding such unenforceability, unconstitutionality, or invalidity. The general assembly hereby declares that it would have passed each provision, section, subsection, sentence, clause, phrase, or word thereof, irrespective of the fact that any one or more provisions, sections, subsections, sentences, clauses, phrases, or words of this chapter, or the application of this chapter to any person, circumstance, or period.

Mo. Rev. Stat. § 188.018; *id*. §§ 188.056.4 (eight-week provision), 188.057.4 (14-week provision), 188.058.4 (18-week provision), 188.375.9 (20-week provision). Moreover, HB 126's severability clauses merely reinforce the strong presumption in favor of severability that is already codified in Missouri statutory and decisional law. *See* Mo. Rev. Stat. § 1.140.

## II.    The Other Three *Dataphase* Factors Favor the State.

The remaining *Dataphase* factors include "(2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest." *Watkins*, 346 F.3d at 844 (citing *Dataphase*, 640 F.2d at 114). All these factors weigh against Plaintiffs' request for relief.

First, the harms inflicted on the State and innocent third parties from enjoining the enforcement of HB 126 would be extremely severe. As discussed in greater detail above, these harms include, but are not limited to, the following: (1) the loss of innocent human life from the killing of unborn children at advanced stages of gestation, Aultman Decl. ¶¶ 10-83; (2) the probable infliction of horrible pain on highly developed fetuses in the second trimester, Condic Decl. ¶¶ 8-48; (3) the subjection of women to "exponentially" increased risks of physical and psychological adverse effects from abortions at later stages of gestation, Coleman Decl. ¶¶ 9-74; (4) the continued threat to the integrity of the medical profession from its involvement in taking human life, including the lives of highly developed unborn children, and the concomitant risks to society from this process, Curlin Decl. ¶¶ 43-53; (5) the perpetuation of the practice of second-trimester abortion that is viewed as unacceptable in the vast majority of the international community, Dyer Decl. ¶¶ 9-14; (6) the continued targeting of persons with Down Syndrome for elimination through abortion, and the perpetuation of historical invidious discrimination against persons with Down Syndrome that threatens their complete elimination as a class of persons, McCaffrey Decl. ¶¶ 12-42; and (7) the permission of invidious race-based and sex-based discrimination in abortion decisions against unborn children based on their immutable characteristics. As the Missouri General Assembly found, the public interest overwhelmingly

favors the elimination of all of these grave injustices. HB 126 "is in itself a declaration of public interest and policy." *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937).

The alleged harms to Plaintiffs' future patients are minimal in comparison. As discussed above, the second-trimester Gestational Age Restrictions and the Anti-Discrimination Law will have no impact at all on the vast majority of Missouri women. *See* Crumbliss Decl. ¶ 15. Even the eight-week restriction will have no impact on a very large percentage of women seeking abortions in Missouri. *Id.* Further, many of the women who otherwise would have sought abortions after the law's gestational-age benchmarks can still obtain abortions earlier in their pregnancies without undue difficulty. In addition, women who claim that they could not have obtained a pre-viability abortion prior to the gestational-age benchmarks are entitled to seek relief through an appropriate as-applied challenge, which is the proper vehicle in which to consider any claim of undue burden or irreparable injury. *Gonzales*, 550 U.S. at 167-68. In considering a facial challenge, the Court should not give weight to claims of irreparable injury based on injuries that could be readily addressed through more appropriate, as-applied challenges. *Id.*

Finally, as many courts have recognized, an order that prevents the State from enforcing its duly enacted laws is heavily disfavored and inflicts *per se* irreparable injury on the State. *See, e.g., 1-800-411-Pain Referral Service, LLC v. Otto*, 744 F.3d 1045, 1053-54 (8th Cir. 2014). "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). "When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its law." *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013); *Coalition for Economic Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997).

Where the party opposing equitable relief is the government, consideration of the public interest "merge[s]" with consideration of harm to the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also, e.g., Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Thus, the public has a strong interest in the enforcement of duly enacted laws and validly promulgated regulations. *Peterson v. Village of Downers Grove*, No. 14-C-09851, 2016 WL 427566, at *5 (N.D. Ill. Feb. 4, 2016); *Abbott*, 734 F.3d at 419. Courts should not "ignore the judgment" of the legislature "deliberately expressed in legislation," and "override [the legislature's] policy choice, articulated in a statute, as to what behavior should be prohibited." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001).

## CONCLUSION

Plaintiffs' Motion for Preliminary Injunction and/or Temporary Restraining Order, Doc. 2, should be denied.

Dated: August 19, 2019     Respectfully submitted,

**ERIC S. SCHMITT**
Attorney General

 */s/ D. John Sauer*
D. John Sauer, #58721
 Solicitor General
Julie Marie Blake, #69643
 Deputy Solicitor General
Emily A. Dodge, #53914
 Assistant Attorney General
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
Fax: (573) 751-0774
E-mail: John.Sauer@ago.mo.gov

*Counsel for State Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 19, 2019, the foregoing was filed electronically through the Court's electronic filing system to be served electronically on counsel for all parties.

*/s/ D. John Sauer*