IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

REPRODUCTIVE HEALTH SERVICES OF )
PLANNED PARENTHOOD OF THE ST. LOUIS )
REGION, INC., et al., )
                                                    )
      Plaintiffs, )
                                                    )      Case No. 2:19-cv-4155-HFS
v. )
                                                    )
MICHAEL L. PARSON, in his official capacity )
as Governor of the State of Missouri, et al., )
                                                    )
      Defendants. )

**STATE DEFENDANTS' SUGGESTIONS IN OPPOSITION TO
PLAINTIFFS' MOTION FOR RECONSIDERATION AND/OR
MOTION FOR PRELIMINARY INJUNCTION**

      Based on Plaintiffs' prior allegations, this Court previously concluded that their challenge to the Down Syndrome provision of Mo. Rev. Stat. § 188.038.2 "is not currently fit for judicial resolution given the paucity of evidence" provided by Plaintiffs regarding the actual impact of the law. *Comprehensive Health of Planned Parenthood Great Plains v. Hawley*, 903 F.3d 750, 757 (8th Cir. 2018). The additional evidence submitted by Plaintiffs—consisting of a single declaration of Dr. McNicholas, Doc. 60-1—confirms that this Court was correct in its prior ruling. Dr. McNicholas fails to allege or identify any prior instance in which Plaintiffs performed or induced an abortion while knowing that it was sought solely because of Down Syndrome, and fails to allege or identify any current or future patient who is seeking or will imminently seek an abortion solely because of Down Syndrome.

      The State Defendants incorporate by reference and reassert all their evidence and arguments in their prior filings and at oral argument, Docs. 32, 33, 35, 48, and 54, including

1

attached exhibits. Because of the Court's stated preference for brevity, the State Defendants highlight the following points, while also relying on their earlier evidence and arguments.

**I.  The State Defendants do not dispute that the Court retains jurisdiction to address the validity of the Down Syndrome provision while their appeal is pending.**

The State Defendants do not dispute that the Court retains jurisdiction to consider Plaintiffs' latest motion for preliminary injunction as to the Down Syndrome provision, § 188.038.2, RSMo, while the State's appeal from the preliminary injunction against the Gestational Age Restrictions is still pending.  The Court may make additional rulings on matters outside the scope of the appeal because the court "was not divested of jurisdiction once" the State Defendants filed their interlocutory appeal of the preliminary injunction.  *Burns v. City of Apple Valley*, 30 F. App'x 670 (8th Cir. 2002).  This Court has "the authority to grant final judgment in favor of defendants."  *Id.*; *see also Doby v. Hickerson*, 5 F.3d 531 (8th Cir. 1993) (same).  "[T]he pendency of an interlocutory appeal from an order granting or denying a preliminary injunction does not wholly divest the District Court of jurisdiction over the entire case."  *W. Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1229 (8th Cir. 1986).  "[W]here, as here, the appeal is from an interlocutory order denying a motion for preliminary injunction, . . . the filing of the notice of appeal from such an order does not *ipso facto* divest the district court of jurisdiction to proceed with the cause with respect to any matter not involved in the appeal, or operate to automatically stay other proceedings in the cause pending the appeal."  *Janousek v. Doyle*, 313 F.2d 916, 920 (8th Cir. 1963).  Because the validity of the Down Syndrome law is "not involved in the appeal," *id.*, the Court retains jurisdiction to address it, absent a contrary order from the Court of Appeals.

2

## II. Plaintiffs lack Article III standing and ripeness to challenge the Down Syndrome provision, and that issue is not fit for judicial disposition on the scanty factual record provided by Plaintiffs.

Nothing in Plaintiffs' renewed motion—including the scant evidence attached to it—establishes that Plaintiffs have proven Article III standing or ripeness to challenge the Down Syndrome restriction, § 188.038.2, RSMo. Doc. 60, 60-1. On the contrary, the supplemental declaration of Dr. McNicholas, Doc. 60-1, confirms that the Down Syndrome challenge "is not currently fit for judicial resolution given the paucity of evidence" provided by Plaintiffs. *Hawley*, 903 F.3d at 757.

Abortion providers have no "automatic right of standing to challenge an abortion regulation." *Bryant v. Woodall*, 363 F. Supp. 3d 611, 614 (M.D.N.C. 2019). Instead, Plaintiffs have the burden to prove that this Court has jurisdiction, including that they have standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The plaintiffs also must satisfy the ripeness doctrine, which—as both a constitutional matter and a prudential matter—requires courts to stay their hands until a law's effects are felt in a concrete way by the challenging parties. *Nebraska Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1039 (8th Cir. 2000). This jurisdictional inquiry "is a threshold question and must be answered before all other questions." *Pub. Sch. Ret. Sys. of Missouri v. State St. Bank & Tr. Co.*, 640 F.3d 821, 825 (8th Cir. 2011) (citation omitted).

The supplemental declaration of Dr. McNicholas underscores that Plaintiffs lack standing and that this dispute is not concrete enough for judicial resolution. Her affidavit reflects that (1) Plaintiffs have failed to identify any previous patient who has sought an abortion solely because of Down Syndrome, and (2) Plaintiffs contend that they are not aware of any current or future patient who is seeking or will imminently seek an abortion solely because of Down Syndrome. Doc. 60-1. Plaintiffs contend that they know of only a small number of patients who have sought

3

abortions after "receiv[ing] a diagnosis of fetal anomaly," including (in a few cases) a diagnosis Down Syndrome. Doc. 60-1, ¶¶ 6, 8, 9, 11. But Plaintiffs do not allege that they know that any of these patients sought an abortion solely because of that diagnosis—which is the conduct that the statute prohibits physicians to participate in. *See* § 188.038.2, RSMo.

Likewise, Dr. McNicholas's supplemental declaration does not establish any imminent future likelihood that Plaintiffs will learn of abortions sought solely because of Down Syndrome. On the contrary, Dr. McNicholas admits that she and other doctors at the facility "do not require that patients disclose any or all of their reasons" for seeking an abortion. Doc. 60-1, ¶7. Their "records do not systematically capture information" about Down Syndrome diagnoses. *Id*. And she alleges that it is "impossible to specifically recall" how many patients have sought an abortion following a diagnosis of Down Syndrome. *Id*. ¶8. As a result, Dr. McNicholas is only able to personally attest to 3 patients in the last 12 months who "had received a fetal diagnosis of Down Syndrome," and her records search identified only one other such patient who had received a fetal diagnosis of Down Syndrome. *Id*. ¶¶9, 11. She speculates that it is "likely" that other diagnoses of fetal anomaly included diagnoses of Down Syndrome, but provides no further evidence to specify whether or how many did so. Nor does she attest when these prior incidents occurred or provide any evidence of how likely and how soon they may be expected to recur, other than speculation. In fact, she admits that "there is no way to know whether the next patient with a fetal diagnosis of Down Syndrome will seek care at RHS tomorrow, next week, or in the next two months." *Id*. ¶18.

Plaintiffs' limited evidence of prior patients who sought abortions after receiving a diagnosis of fetal anomaly is thus too vague, speculative, and unanchored in time either to support Article III standing or to make a colorable showing of irreparable injury. Standing requires "that

the alleged injury is not too speculative for Article III purposes—that the injury is *certainly impending*." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (citation omitted). But Dr. McNicholas's declaration demonstrates that it is unsure and speculative whether or when any future patient will seek an abortion after receiving a Down Syndrome diagnosis, let alone seek an abortion solely because of that diagnosis. Mo. Rev. Stat. § 188.038.2. Plaintiffs' alleged injury, therefore, is both remote and speculative—not "certainly impending," as required by Article III. *Clapper*, 133 S. Ct. at 1147.

For the same reasons that this Court already denied a preliminary injunction on this question, Doc. 51, Plaintiffs' challenge to the Down Syndrome provision remains unfit for judicial resolution, and Plaintiffs have failed to satisfy Article III's requirements of standing and ripeness on his claim. This challenge is "entirely speculative"—they do not identify any prior patient who sought an abortion solely because of a fetal diagnosis of Down Syndrome, they do not identify any patient is seeking or imminently will seek an abortion solely because of a fetal diagnosis of Down Syndrome, and they provide only speculation about the likely future occurrence of such a situation. *Id*. at 8-9.

Because they cannot show any concrete or imminent effect of the law on any patient, Plaintiffs claim that the law forces them to change their behavior and not perform abortions on fetuses with Down Syndrome. Doc. 60-1, ¶¶12, 13. But Plaintiffs cannot manufacture Article III standing by speculating that they will suffer adverse legal consequences and then voluntarily declining to undertake conduct that does not directly violate the statute. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Dr. McNicholas alleges that she may start asking some women their reasons for abortion and that she may avoid performing any abortion for any patient whose fetus has a prior diagnosis of Down Syndrome, over her concerns about "legal risk." Doc. 60-1,

5

¶¶12-13. But what the statute prohibits is performing an abortion while knowing that the patient is seeking the abortion solely because of a fetal diagnosis of Down Syndreome, Mo. Rev. Stat. § 188.038.2, and Dr. McNicholas does not allege that she has performed or intends to perform such an abortion. *See* Doc. 60-1.

As noted, Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. Standing does not exist, and an injury is not fairly traceable to a law, when the alleged injury is "based on a fear of" the effect of the law or "a reasonable reaction to a risk of harm." *Id*. Accepting such a self-inflicted injury as creating Article III standing would "improperly water[] down the fundamental requirements of Article III." *Id*. "If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear." *Id*.

Because they allege no past or imminent future conduct violating the statute, Plaintiffs offer only speculation about possible enforcement, and so Plaintiffs also fail to show a credible threat of imminent enforcement. "A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 297-98 (1979). In other words, "imaginary or speculative fears of prosecution are insufficient to confer standing." *Bryant v. Woodall*, 363 F. Supp. 3d 611, 614 (M.D.N.C. 2019). Plaintiffs have shown no credible threat of enforcement of the law against the providers in any specific case. They have not alleged that an abortion provider at this facility has or will imminently abort a fetus with knowledge that the abortion is sought solely because of a Down Syndrome diagnosis.

The burden is on Plaintiffs, not the State, to establish their Article III standing at this (and every other) stage of litigation, and they have simply not done so. As a result, this case "is not currently fit for judicial resolution given the paucity of evidence on" the future likelihood or imminence of this prohibited form of abortion. *Comprehensive Health of Planned Parenthood Great Plains v. Hawley*, 903 F.3d 750, 757 (8th Cir. 2018).

## III. Plaintiffs have not established third-party standing or a third-party cause of action for any claim, including their challenge to the Down Syndrome provision.

The paucity of evidence on the actual impact of the law on any patients of the abortion providers emphasizes why patients themselves, not abortion providers, are only the proper parties to assert their own rights, under both the jurisdictional doctrine of third-party standing and the plain language of 42 U.S.C. § 1983.

### A. Plaintiffs lack a third-party cause of action under 42 U.S.C. § 1983.

Plaintiffs lack a cause of action under 42 U.S.C. § 1983 to assert the rights of third parties. They neither possess nor assert any of *their own* constitutional rights. *See* Doc. 1, ¶¶ 80, 82, 84, 86, 88; *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 912 (6th Cir. 2019) (en banc); *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 884 (1992) (plurality opinion). Instead, they assert only the rights of third parties—their patients. But Plaintiffs have not been provided a third-party cause of action under 42 U.S.C. § 1983 or under any other law. *See* Doc. 1; *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015). Under the plain language of Section 1983, only "the party injured"—*i.e.,* the "citizen of the United States" who has been subjected to a "deprivation of any rights, privileges, or immunities secured by the Constitution," *id.*—may sue to enforce those rights. 42 U.S.C. § 1983. This statutory restriction on the assertion of third-party rights is more restrictive than the related doctrine of third-party

7

standing, because it does *not* include the exceptions to third-party standing that federal courts have recognized. *See* David P. Currie, *Misunderstanding Standing*, 1981 SUP. CT. REV. 41, 45.

The Eighth Circuit has thus consistently interpreted this language in Section 1983 to foreclose any attempt to assert the rights of third parties through Section 1983. *See, e.g., Garrett v. Clarke*, 147 F.3d 745, 746 (8th Cir. 1998); *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006); *cf. FCS Advisors, LLC v. Missouri*, 929 F.3d 618, 621 (8th Cir. 2019). The law is the same in other circuits. *See, e.g., Barker v. Halliburton Co.*, 645 F.3d 297 (5th Cir. 2011) ("A third party may not assert a civil rights claim based on the civil rights violations of another individual."); *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000) (explaining that section 1983 is "entirely personal to the direct victim of the alleged constitutional tort ... only the purported victim, or his estate's representative(s), may prosecute a section 1983 claim"); *Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990) (noting the "well-settled principle that a section 1983 claim must be based upon the violation of plaintiff's personal rights, and not the rights of someone else").

This interpretation of Section 1983 is also mandated by the Supreme Court's and Eighth Circuit's repeated holding that "[t]o support an action under § 1983, a plaintiff relying on a federal law must establish that Congress *clearly intended* to create an enforceable federal right . . . . It is now settled that nothing short of an *unambiguously conferred right* will support a cause of action under § 1983." *Does v. Gillespie*, 867 F.3d 1034, 1039-40 (8th Cir. 2017) (emphasis added) (quotation marks and citations omitted). To provide a cause of action, Congress must speak "with a clear voice that manifests an unambiguous intent to confer individual rights." *Id.* at 1043; *see also, e.g., Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 164–65 (2008) ("In the absence of congressional intent the Judiciary's recognition of an implied private right of action

8

necessarily extends its authority to embrace a dispute Congress has not assigned it to resolve."). These cases follow the Supreme Court's directive in *Alexander v. Sandoval*, 532 U.S. 275 (2001), where the Court held: "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress. . . . Without [statutory intent], a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter." *Id.* at 286-87; *see also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855–56 (2017) ("If the statute itself does not display an intent to create a private remedy, then a cause of action does not exist and courts may not create one . . . . If the statute does not itself so provide, a private cause of action will not be created through judicial mandate."). The same rule of interpretation—*i.e.*, that a statute must contain an explicit statement that it is creating a private cause of action for a court to infer that one exists—applies *a fortiori* to the text of Section 1983 itself, just as it applies to federal statutes that plaintiffs sometimes seek to enforce through actions under Section 1983. Here, Section 1983 plainly does not contain an "unambiguously conferred right" to assert the constitutional rights of someone else. On the contrary, Section 1983 unambiguously *forecloses* such assertions of third-party rights.

Although this Court came to a contrary conclusion in its prior order, *see* Doc. 50, at 2, the Court should reconsider this conclusion. No case from the Supreme Court or the Eighth Circuit has considered or addressed, let alone upheld, a third-party cause of action under Section 1983 for abortion providers to assert the interest of their patients. *See, e.g.*, *Comprehensive Health of Planned Parenthood Great Plains v. Hawley*, 903 F.3d 750 (8th Cir. 2018); Doc. 51, at 2. Accordingly, the cases in which the issue was never raised, considered, or addressed, do not support the assertion of such a claim here. *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952). A cause of action is essential in every case, and so, even if a defendant did not

9

challenge the existence of a cause of action in a past case, in future cases a plaintiff must still show that it has a cause of action. Doc. 33 at 11. This Court should follow the plain language of 42 U.S.C. § 1983 and the Eighth Circuit's cases that hold that Section 1983 does not authorize lawsuits to enforce the alleged constitutional rights of third parties.

**B. Plaintiffs lack third-party standing.**

Plaintiffs also lack third-party standing because they have not submitted sufficient evidence or allegations of either a "close relationship" with future hypothetical patients or a "hindrance" to women suing for themselves. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004).[1] As the Supreme Court emphasized in both *Singleton v. Wulff*, 428 U.S. 106, 118 (1976), and *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004), the doctrine of third-party standing exists in large part because some parties do not wish to assert their own rights. *Kowalski*, 543 U.S. at 129 (noting that the rule of third-party standing "assumes that the party with the right has the appropriate incentive to challenge (or *not challenge*) governmental action") (emphasis added); *Singleton*, 428 U.S. at 113-

---

[1] This jurisdictional burden applies with full force to plaintiffs in the abortion context. Even though the plurality opinion in *Singleton v. Wulff* asserted that it might "generally [be] appropriate" for abortion providers to challenge abortion regulations on behalf of their patients, 428 U.S. 106, 118 (1976), that plurality opinion also held that plaintiffs still must prove the requirements of third-party standing with evidence "in a particular case." *Id.* (emphasis added). *Singleton*, 428 U.S. at 114. But even if this plurality opinion, which requires a particular analysis, had relieved Plaintiffs of their jurisdictional burden, it still should not be read as the binding holding of the case. The controlling opinion in *Singleton* is the narrower opinion of Justice Stevens that provided the fifth vote for the result. *Id.* at 121-22 (Stevens, J., concurring in part). Justice Stevens concurred only because "the plaintiff-physicians have a financial stake in the outcome of the litigation," and the abortion providers "claim[ed] that the statute impairs their own constitutional rights." *Singleton*, 428 U.S. at 121. Here, the abortion providers neither assert their own financial injury nor their own constitutional rights. And, even if these allegations had been made here, the claimed constitutional right would be baseless and not support jurisdiction. *Casey*, 505 U.S. at 884 (plurality opinion); Doc. 33 at 2. Nor does a defendant's failure to raise a jurisdictional defect in prior cases excuse plaintiffs of their burden to prove standing and ripeness in future cases. "When a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed." *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144-45 (2011).

14 ("First, the courts should not adjudicate such rights unnecessarily, and it may be that in fact the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not.") (citing *Ashwander v. TVA*, 297 U.S. 288, 345-48 (1936) (Brandeis, J., concurring). Allowing third parties—such as abortion providers, who have financial and ideological interests that differ from and conflict with those of their patients—to assert claims on behalf of their hypothetical future patients, forces the courts to adjudicate unnecessary constitutional disputes.

Plaintiffs do not assert the interests of any current patients in their Complaint, merely hypothetical future patients. Doc. 1. The same is true of their most recent motion. *See* Doc. 60-1. But under *Kowalski*, Plaintiffs seeking to represent unidentified possible future patients based on a "hypothetical [doctor-patient] relationship," really have "no relationship at all" on which to claim standing. *Kowalski*, 543 U.S. at 131. For abortions targeted at fetuses with Down Syndrome, this Court held that Plaintiffs failed to provide evidence that the anti-discrimination Law "would be likely to interfere with the abortion rights of real-life women," leaving the issue "entirely speculative." Doc. 50, at 9.

What is more, the relationship between Plaintiffs and their patients is rife with potential conflicts of interest. Doc. 33 at 5-7. Abortion providers do not have the same interest in upholding health and safety protections as women, or interests in the life and welfare of the fetus. Plaintiffs also do not allege any "hindrance" to their future hypothetical patients' ability to assert their own interests in court. *See* Doc. 1. Individual women can and do assert their own abortion claims, throughout history and recently in Missouri, either in their own names or under pseudonyms, and this Court should not assume that they cannot do so again if they choose. Doc. 33 at 5-7.

This court should not decide that constitutional question unless it faces a concrete, specific, as-applied dispute involving an individual patient who desires to obtain an abortion solely because of Down Syndrome. The fraction-of-a-fraction of women in Missouri seeking abortion solely on this basis—if any desire to do so—could and should seek relief on an as-applied basis. As the Supreme Court emphasized in *Gonzales v. Carhart*, 550 U.S. 124, 167-68 (2007): "As-applied challenges are the basic building blocks of constitutional adjudication. . . . The Act is open to a proper as-applied challenge in a discrete case." *Id.* (citations omitted).

**C. The law is constitutional on the merits.**

In any event, this law is constitutional on its merits for several reasons. First, neither *Casey* nor Eighth Circuit precedent holds that all restrictions on pre-viability abortion are *per se* unconstitutional. Doc. 35, at 8-13. Indeed, neither the Supreme Court nor the Eighth Circuit has ever ruled on the validity of anything similar to the Down Syndrome provision. Second, the large-fraction test forecloses Plaintiffs' facial challenges. Doc. 35, at 13-17. Third, the anti-discrimination law satisfies strict scrutiny or any other level of constitutional scrutiny, Doc. 35, at 25-33, because it is precisely tailored to advance the State's compelling interest in preventing persons with Down Syndrome from being targeted for elimination solely because of that immutable characteristic. The provision is constitutional for the other reasons that the State has presented as well. *See* Docs. 33, 35, 48, 54. "Using abortion to promote eugenic goals is morally and prudentially debatable on grounds different from those that underlay statutes *Casey* considered. . . . None of the Court's abortion decisions holds that states are powerless to prevent abortions designed to choose the sex, race, and other attributes of children." *Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r of Indiana State Dep't of Health*, 917 F.3d 532, 536 (7th Cir. 2018) (Easterbrook, J., dissenting from the denial of rehearing en banc).

## IV. The equities disfavor an injunction.

As this Court observed about the anti-discrimination law, an injunction is not appropriate where "the denial of immediate relief is not demonstrably harmful." Doc. 50, at 8. Plaintiffs have shown no new evidence that the denial of a preliminary injunction is harmful. On the contrary, Plaintiffs' new evidence confirms that they fail to identify any concrete instance in which any woman would be harmed by the law and wish to challenge it. Under these circumstances, Plaintiffs have not made any colorable showing of irreparable injury, because they have provided no concrete evidence of how the prohibition "would be likely to interfere with the abortion rights of real-life women," leaving their claim of injury "entirely speculative." Doc. 51, at 9. Moreover, if any woman in Missouri desires to have an abortion solely because of a fetal diagnosis of Down Syndrome, she would not be irreparably harmed by the denial of a preliminary injunction in this case, because she is free to bring an as-applied challenge to the statute if and when she desires to obtain that abortion—which is what the Supreme Court explicitly contemplated in *Gonzales v. Carhart*, 550 U.S. at 167-68.

By contrast, the irreparable injury to the State from an injunction would be severe indeed. Dr. McNicholas alleges that it is "appalling" that she might not perform abortions on fetuses with Down Syndrome. Doc. 60-1, at 13. On the contrary, what is "appalling" is the targeting of an entire class of people who share an immutable characteristic—individuals with Down Syndrome—for elimination solely because of that immutable characteristic. The medical establishment's shameful history of neglect and mistreatment of individuals with Down Syndrome continues to this day in the practice of eugenic abortion. Doc. 35, at 26-28. Only a few decades ago, a prominent physician described children with Down Syndrome as "mere blobs," and their life expectancy was 10 years because of abuse, neglect, institutionalization, and denial of medical care. Doc. 35-8, Declaration of Dr. Martin McCaffrey, ¶¶ 12-20. In fact, "the history of the medical

13

establishment's approach to Down syndrome over the last century has been dominated by discrimination," and "[i]t has actually been the discrimination against those with intellectual disability manifested in depriving them of medical care that has shortened lives for individuals with Down syndrome." *Id.* ¶¶ 12, 14. This medicalized discrimination continues to this day through the practice of eugenic abortion, which is the ultimate form of shortening lives, *id.* ¶ 21, and which has effectively eliminated all persons with Down Syndrome in Iceland and Scandinavia and leads to the abortion of 61 to 93 percent of children with Down Syndrome in the United States. *Id.* ¶¶ 26, 48. Given these realities, the balancing of harms and the public interest overwhelmingly favor the State.

## CONCLUSION

This Court should deny Plaintiffs' Motion for Reconsideration and/or for a Preliminary Injunction, Doc. 59.

Dated: September 11, 2019   Respectfully submitted,

**ERIC S. SCHMITT**
Attorney General

 /s/ *D. John Sauer*
D. John Sauer, #58721
 Solicitor General
Julie Marie Blake
Justin D. Smith
Emily A. Dodge
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
Fax: (573) 751-0774
E-mail: John.Sauer@ago.mo.gov

*Counsel for the State Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 11, 2019, the above was filed electronically through the Court's electronic filing system to be served electronically on counsel for all parties.

*/s/ D. John Sauer*