IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
Central Division

Reproductive Health Services of Planned )
Parenthood of the St. Louis Region, Inc., )
on behalf of itself, its physicians, and its )
patients, and Colleen P. McNicholas, D.O., )
M.S.C.I., F.A.C.O.G, on behalf of herself )
and her patients, )
                                                  ) Case No. 2:19-cv-4155-HFS
      Plaintiffs, )
                                                    )
      v. )
                                                    )
Michael L. Parson, in his official capacity )
as Governor of the State of Missouri, et. al., )
                                                    )
      Defendants. )

**SUPPLEMENTAL ORDER REGARDING DOWN SYNDROME**

The State Defendants were recently enjoined pending litigation from enforcing legislation prohibiting abortions at various weekly stages of fetal development prior to viability. This ruling is on appeal.

A preliminary injunction was denied, however, concerning statutory prohibitions of "discriminatory" abortions of non-viable fetuses, where the sole reason for the abortion was the sex or race of the fetus. Defendant providers disclaimed any knowledge of such abortions at their facilities, and none could be predicted, so the issue was deemed moot. Those prohibitions remain on the statute books.

Similarly denied, but without prejudice, was a preliminary injunction motion against prohibiting abortions motivated by testing indicating Down Syndrome. The prohibition of such abortions is prescribed by Mo. Rev. Stat. §188.038.2. This sub-section is the subject matter of a new motion for reconsideration, or, in the alternative, for a preliminary injunction. Doc. 59.[1]

---

[1] The parties agree, as do I, that this is a collateral issue on which I retain jurisdiction.

1

The earlier ruling on "Down Syndrome abortions" stated that abortions of non-viable fetuses have been protected under Federal case-law, based on Supreme Court decisions, and that plaintiff providers are clearly "likely to prevail in striking down the prohibited reasons law, insofar as it applies to non-viable fetuses." Doc. 51; Reproductive Health Services of Planned Parenthood of St. Louis Region, Inc. v. Parson, 389 F.Supp.3d 631, 636 (W.D. Mo. 2019). Injunctive relief could not be entered, however, in the absence of a showing that "the inability to schedule 'Down syndrome abortions' would likely interfere with the abortion rights of real-life women during the time-frame of this law suit." Id at 638. I suggested further consideration of "an adequately supported renewed motion on this narrow issue." Such a motion was promptly filed, with additional information from co-plaintiff McNicholas, apparently the best informed person.[2]

Before turning to the current factual situation and the legal contentions of the parties, a practical consideration may place this part of the dispute in context. If a preliminary injunction continues to be denied, because of a deficiency in proof regarding women likely to be seeking abortions because of Down syndrome testing of a fetus, there is a distinct possibility that such an abortion patient may report to plaintiff providers any day or week during litigation. Without injunctive protection in place, it is predictable that a legal emergency would ensue; that is, a temporary restraining order would be sought to allow the abortion to take place. The likelihood of granting a TRO would be strong. There would then likely ensue hectic back-and-forth litigation like that which occurred from October 18-26, 2017, as described in Azar v. Garza, 138 S.Ct. 1790 (2018). While the courts may be disciplined to handle such situations, it would be most difficult to have the sort of orderly and thorough appellate consideration of the ultimate merits that was invited by the Supreme Court on this very issue. Box v. Planned Parenthood of Indiana and Kentucky, Inc., 139 S.Ct. 1780 (2019). I confess some relief that my appraisal of the factual situation here is consistent with an orderly processing of the controversy.

---

[2] The State Defendants do not question the information supplied, and offer nothing further – but do contend that the plaintiffs' material remains insufficient to authorize relief.

The facts do support injunctive relief now, as outlined below, although the Down Syndrome condition in the population is quite rare, thus suggesting rather infrequent abortion requests. A "Down Syndrome Center" brochure, submitted by plaintiffs, suggests that "one in every 800-1000 children" has been so diagnosed. Doc. 47-4, Ex. B. See comparable figures in Doc. 60-1 Ex. 1, p.4.[3] But the McNicholas Supplemental Declaration (Doc. 60-1) indicates that, even without inquiry by providers before performing abortions, she specifically recalls that three patients she treated in the last 12 months had received "a fetal diagnosis of Down Syndrome." ¶ 9. She also estimated she had "approximately one to four cases per week" reporting a "genetic or structural anomaly," and that Down syndrome is "the most common fetal aneuploidy." (abnormal number of chromosomes in a cell). ¶ 10.

The only available information that might tend to reduce the number of such patients was a review of medical records identifying only four patients in 13 months where Down Syndrome may have been present. Doc. 60-1, ¶ 11. But those records were referred to as "underinclusive," a characterization not questioned by the State Defendants. The absence of information and records is explained by plaintiffs' view prior to the new statute that abortion decisions are for the patients to make, without any special inquiries by the providers – thus, any information that is available was inadvertently received.

With the high level of "genetic or structural anomal[ies]" and Down Syndrome being the most common abnormality of numbers of chromosomes in a cell, it should fairly be concluded that Dr. McNicholas' personal dealing with one identified Down Syndrome abortion at about four-month intervals considerably understates the abortions of that nature at plaintiff's facility. If I would now project eight more months of litigation before judgment (perhaps by summary judgment) I must

---

[3] This would relate to living children, thus failing to include the significant number of fetal abortions.

3

conclude that at least a small number of women would predictably need protection during litigation, if the statutory prohibition is invalid.[4]

For reasons mentioned earlier (Doc. 65, p. 3) the State Defendants have not and are unlikely to belittle the significance of even a few abortions during litigation, and I conclude that the requested protection of the abortion rights of a few women during litigation should suffice to authorize short-term anticipatory injunctive protection. I adopt but do not repeat legal discussion of standing issues and the like dealt with in the prior ruling, now in print, and in the denial of a stay. Doc. 65. These issues are on appeal and should probably not be elaborated on or re-articulated while the Circuit Court has jurisdiction.

The State Defendants' most current procedural objection relies on two aspects of the circumstances at bar. They repeatedly refer to the statutory requirement that the forbidden motive be the "sole" cause of the abortion and they argue that there is an absence of the necessary "certainty" in the prediction of likely requests for the forbidden "Down syndrome abortions," citing <u>Clapper v. Amnesty Int'l. USA</u>, 568 U.S. 398, 409 (2013).

Common understanding and judicial notice would conclude that a Down syndrome diagnosis (or even a strong suspicion based on testing) would often be received with dismay by a pregnant woman and any family members. If an abortion were sought thereafter, most of us, including an abortion provider, would suppose that the diagnosis was the principal cause of the request, and that a jury or licensing agency would have little trouble with the "sole cause" requirement for a violation. As the Chief Justice recently observed, quoting Judge Friendly, "'we are not required to exhibit a naiveté from which ordinary citizens are free.'" <u>Dept. of Commerce v. New York</u>, 139 S. Ct. 2551, 2575 (2019).

On the issue of "certainty" of a Down Syndrome motivated abortion request during litigation, the facts reviewed show a very high likelihood of such an occurrence, if litigation continues for a considerable period. And where the plaintiff providers are "themselves the objects of a challenged

---

[4] I agree with plaintiffs that the appeal, and the stay of procedures on the motion to dismiss (because they duplicate, in part, issues before the Court of Appeals) makes this litigation more protracted than I had anticipated.

statute" the Circuit quite recently noted that Clapper does not set the standard of likely danger that the courts use before entertaining a challenge. Alexis Bailly Vineyard, Inc. v. Harrington, 931 F.3d 774, 778-79 (8th Cir. 2019).

Clapper itself, with relatively uninvolved parties, noted that "[o]ur cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about." 568 U.S. at 414 n. 5. In our case, the most likely scenario, from plaintiffs' filings, would be the provider's declining a requested abortion, *in terrorem.* Absent a hurried TRO or a preliminary injunction, the prospective patient would lose the Constitutional right to which she is currently entitled. That right needs protection here - - and no discernible legal harm would occur from granting the preliminary injunction as requested, which simply supplements the restriction now in place.[5]

The order entered on August 27 (Doc. 51; 389 F.Supp.3d at 640) is hereby MODIFIED to prohibit the Missouri official defendants, their employees, agents and successors in office from enforcing, pending litigation, Mo. Rev. Stat. §188.038.2. insofar as it relates to non-viable fetuses. SO ORDERED.

                                                                */s/ Howard F. Sachs*
                                                                Howard F. Sachs
                                                                United States District Judge

September 27, 2019
Kansas City, Missouri

---

[5] The appellate panel would doubtless retain the right to ask counsel for a report, immediately before argument on appeal or before handing down an opinion, regarding Down Syndrome abortion experience of plaintiffs pending litigation. The provider is required to certify knowledge of such abortions under a statutory provision not involved in litigation. Mo. Rev. Stat. §188.052.1. Thus, if the panel later determined that lack of experience under the prohibition demonstrates there is a moot issue, an appellate ruling on the merits could be declined and this phase of the proceeding would be rendered harmless.