IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| REPRODUCTIVE HEALTH SERVICES OF PLANNED PARENTHOOD OF THE ST. LOUIS REGION, INC., et al., | ) ) ) ) |
| Plaintiffs, | ) ) ) Case No. 2:19-cv-4155-HFS |
| v. | ) ) |
| MICHAEL L. PARSON, in his official capacity as Governor of the State of Missouri, et al., | ) ) ) |
| Defendants. | ) ) |

**STATE DEFENDANTS' MOTION FOR STAY PENDING APPEAL OF PRELIMINARY INJUNCTION AGAINST THE DOWN SYNDROME RESTRICTION AND FOR AN EXPEDITED BRIEFING SCHEDULE ON THIS MOTION**

Under Federal Rule of Appellate Procedure 8(a)(1) and the Federal Rules of Civil Procedure, the State Defendants respectfully move this Court to stay pending appeal its order granting a preliminary injunction against the enforcement of Mo. Rev. Stat. § 188.038.2, which prohibits performing or inducing an abortion when the provider knows that the abortion is sought solely because of a diagnosis, test, or screening indicating Down Syndrome or the potential for Down Syndrome in an unborn child. Doc. 69.

As noted in the State's prior motion for stay pending appeal, Doc. 54, a motion for stay of injunction pending appeal is governed by the same four equitable factors that govern the decision whether to grant a preliminary injunction, except that likelihood of success on appeal is the focus of the first factor. *Hilton v. Braunskill*, 481 U.S. 770, 776-78 (1987). A stay is warranted when the appeal presents "serious" legal issues and the balance of equities favors the stay applicant. *James River Flood Control Ass'n v. Watt*, 680 F.2d 543, 545 (8th Cir. 1982). The State Defendants respectfully submit that this standard is satisfied here.

1

In support of this request, the State Defendants incorporate by reference and reassert all the evidence and arguments submitted in their prior filings opposing the entry of a preliminary injunction on this issue, *see* Docs. 33, 35, 48, and 62, along with attached Exhibits, as well as the arguments presented in their motion for stay pending appeal regarding the 20-week restriction, *see* Docs. 54, 64. The State Defendants highlight the following points, while also relying on their earlier evidence and arguments:

### I. The State Defendants Are Likely to Prevail on Appeal.

The State Defendants are likely to prevail on appeal for several reasons.

### A. Plaintiffs lack third-party standing and a third-party cause of action under 42 U.S.C. § 1983.

First, for the reasons discussed in detail in prior briefing, the State Defendants are likely to prevail on appeal in their argument that abortion providers lack a third-party cause of action under 42 U.S.C. § 1983 to assert the rights of their hypothetical future patients. *See, e.g.,* Doc. 54, at 2-8; Doc. 64, at 1-4. Abortion providers have no constitutional rights of their own in this context, and they rely solely on Section 1983 to create a cause of action. Yet the Eighth Circuit has held, consistent with the plain language of Section 1983, that the statute does not create any third-party cause of action, and there is widespread consensus on this point in the federal Courts of Appeals.

Second, for the reasons discussed in detail in prior briefing, the State Defendants are likely to prevail on appeal in their argument that abortion providers lack third-party standing under Article III and prudential principles to assert the rights of hypothetical future patients. *See id.* The abortion providers lack a "close relationship" with these hypothetical patients, and in fact the relationship is rife with potential conflicts of interest. *See Kowalski v. Tesmer*, 543 U.S. 125, 131 (2004). Moreover, there is no "hindrance" to patients asserting their own rights, as dozens of reported cases challenging abortion restrictions brought by individual women under pseudonyms

2

demonstrate. *See id.*; Doc. 33, at 7-8 (citing numerous cases). At very least, Plaintiffs had the burden to come forward with *evidence* to demonstrate the existence of a close relationship and hindrance to establish third-party standing, and they produced none.

> B. **No case or controversy exists, and the case is not "fit for judicial resolution" in the absence of any individual patient who claims to be affected by the statute or any evidence regarding the law's impact on real-world patient or patients.**

Third, as discussed in the State's opposition to Plaintiffs' renewed motion for preliminary injunction, Doc. 62, the issues in this challenge to the Down Syndrome provision are not currently fit for judicial resolution due to the paucity of evidence regarding how the provision impacts women in the real world. *Comprehensive Health of Planned Parenthood Great Plains v. Hawley*, 903 F.3d 750, 757 (8th Cir. 2018). Although this case has now been pending for two months, Plaintiffs still have not identified a single real-world patient whom they contend has sought or will imminently seek an abortion solely because of Down Syndrome. *See* Doc. 60-1. This failure to present a concrete, specific, individualized circumstance of the challenged law's application renders their challenge unfit for judicial resolution under Article III, prudential principles, and the equitable principles that govern preliminary injunctions.

In coming to the opposite conclusion, this Court emphasized the "practical consideration" that requiring Plaintiffs to identify a specific patient or patients would result in "hectic back-and-forth litigation." Doc. 69, at 2. The State Defendants respectfully submit that this practical consideration cuts in the opposite direction. Though it may sometimes result in "hectic" litigation, Article III's requirement of a concrete, specific, individualized dispute represents a fundamental constitutional limitation on the authority of Article III courts. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). This Court expressed the concern that, given the prospect of hectic litigation, "it would be most difficult to have the sort of orderly and thorough appellate

3

consideration of the ultimate merits that was invited by the Supreme Court on this very issue." Doc. 69, at 2. But Plaintiffs have provided no reason to suppose that such a case could not be fully and carefully considered in further proceedings and on appeal, even after a TRO ruling, under the "capable of repetition, yet evading review" exception to the mootness doctrine, which has often been applied in the context of abortion restrictions.

This Court concluded that an injunction was warranted because "there is a distinct *possibility* that such an abortion patient may report to plaintiff providers any day or week during litigation." Doc. 69, at 2 (emphasis added). But, as the Supreme Court has repeatedly held, Article III requires more than a "possibility"—it requires that the injury be "certainly impending." *Clapper*, 568 U.S. at 409 ("[W]e have repeatedly reiterated that the threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient.") (emphases in original) (quotations and alterations omitted). This Court also stated that, given that litigation may continue for months, it is "predictabl[e]" that such a patient will emerge at some time while litigation is pending. Doc. 69, at 4. But, in a case that the State Defendants cited with emphasis in their jurisdictional motion to dismiss, which they incorporated into their preliminary-injunction opposition, *see* Doc. 33, at 4-5, the Supreme Court has held that the "statistical probability" that an affected party would emerge is insufficient to establish third-party standing. *Summers v. Earth Island Institute*, 555 U.S. 488, 498 (2009). A specific, concrete, real-world patient must be presented to create a "case or controversy" under Article III. *See id.* (holding that third-party standing under Article III requires "specific allegations establishing that at least one *identified* [third party] had suffered or would suffer harm") (emphasis added); *Kowalski*, 543 U.S. at 131 (holding that, for purposes of third-party standing, a hypothetical future relationship is "no relationship at all").

4

Moreover, Plaintiffs' evidence is insufficient to establish anything but a hypothetical, speculative concern that such a specific, concrete situation will emerge while litigation is pending. The Court emphasized Paragraph 10 of Dr. McNicholas's supplemental declaration, Doc. 60-1, in which she stated that she performs abortions on an estimated "one to four cases per week" where there has been a prior "fetal diagnosis." Doc. 60-1, ¶ 10; Doc. 69, at 3. But that statement addressed *any* "fetal diagnosis," whether genetic or "structural"—not just Down Syndrome. Doc. 60-1, ¶ 10 (stating that she "cannot recall whether that diagnosis was Down Syndrome or another genetic or *structural* anomaly") (emphasis added). The declaration went on to state that Down Syndrome was one of the most frequent *genetic* disorders, but it offered no evidence regarding the relative frequency between Down Syndrome and all other fetal diagnoses, including structural diagnoses. *Id.* And that paragraph merely concluded that it was "likely" that "some" unspecified number of prior patients had included prior diagnoses of Down Syndrome, without any information of number or frequency. *Id.* Again, this evidence is too hypothetical and speculative to satisfy Article III.

The Court relied on *Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 778-79 (8th Cir. 2019), Doc. 69, at 5, but that case did not involve any situation like this case, where the plaintiff seeks to assert the constitutional rights of hypothetical third parties who were unidentified and might not exist at all. *See* 931 F.3d at 778. Here, by contrast, *Clapper*'s requirement that the injury must be "certainly impending" applies, as do the requirements of *Summers* and *Kowalski* that an identified, real person must exist to support a claim of third-party standing. *Clapper*, 568 U.S. at 409; *see also Kowalski*, 543 U.S. at 131; *Summers*, 555 U.S. at 498.

The Court also concluded that, in the case of Down Syndrome diagnosis, "the most likely scenario, from plaintiffs' filings, would be the provider's declining a requested abortion, *in*

5

*terrorem*." Doc. 69, at 5. This conclusion, however, contradicts the Supreme Court's holding in *Clapper* that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416.

This Court stated that "[c]ommon understanding and judicial notice would conclude that Down syndrome diagnosis (or even a strong suspicion based on testing) would often be received with dismay by a pregnant woman and any family members." Doc. 69, at 4. As the Court implicitly acknowledged, this supposition is not supported by any evidence submitted by Plaintiffs. More fundamentally, this assumption effectively acknowledges the existence of the deeply ingrained, systemic, and highly medicalized discrimination still faced by persons with Down Syndrome, which § 188.038.2 is designed to eradicate. *See* Doc. 35-8, ¶¶ 12-42. The concern that persons with Down Syndrome may often be greeted with "dismay" by our society is a powerful reason to *uphold* Missouri's law, not to enjoin it.

**C. The Down Syndrome provision is constitutional on the merits.**

The State Defendants are also likely to prevail on the merits in opposing the challenge to the Down Syndrome provision. Plaintiffs' sole argument is that this provision is *per se* unconstitutional under *Planned Parenthood of Southeastern Pennsylvania v. Casey*. This argument lacks merit. *Casey* never considered or addressed anything similar to a Down Syndrome prohibition. On the contrary, a similar provision in Pennsylvania's law—a restriction on sex-selective abortions—went unchallenged in *Casey*. *See* Doc. 35, at 8-9. As Justice Thomas recently stated in this precise context: "Whatever else might be said of *Casey*, it did not decide whether the Constitution requires States to allow eugenic abortions. It addressed the constitutionality of only 'five provisions of the Pennsylvania Abortion Control Act of 1982' that were said to burden the

6

supposed constitutional right to abortion. None of those provisions prohibited abortions based solely on race, sex, or disability." *Box v. Planned Parenthood of Indiana and Eastern Ky.*, 139 S. Ct. 1780, 1792 (2019) (Thomas, J., concurring). "[T]he constitutionality of other laws like [Missouri's] thus remains an open question." *Id.* Several judges of the Seventh Circuit agreed: "*Casey* did not consider the validity of an anti-eugenics law. Judicial opinions are not statutes; they resolve only the situations presented for decision." *Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r of Indiana State Dep't of Health*, 917 F.3d 532, 536 (7th Cir. 2018) (Easterbrook, J., dissenting from denial of rehearing en banc). Indeed, on Plaintiffs' view, the "penumbral" right to pre-viability abortion is elevated above the Constitution's enumerated rights, which is "absurd." *PPINK*, 888 F.3d at 312 (Manion, J., concurring in the judgment).

To argue that *Casey* decided an issue that was never raised or considered—and in fact was purposely not raised—contradicts well-established law. It is axiomatic that, if an issue "was not . . . raised in the briefs or argument nor discussed in the opinion of the Court," then "the case is not a binding precedent on this point." *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952); *see also Steel Co.*, 523 U.S. at 91 ("We have often said that drive-by jurisdictional rulings of this sort . . . have no precedential effect."); *Lewis v. Casey*, 518 U.S. 343, 352 n.2 (1996) (holding that "standing was neither challenged nor discussed in that case, and we have repeatedly held that the existence of unaddressed jurisdictional defects has no precedential effect"); *FEC v. NRA Political Victory Fund*, 513 U.S. 88, 97 (1994) ("The jurisdiction of this Court was challenged in none of these actions, and therefore the question is an open one before us.").

As the Supreme Court signaled in *Box* by inviting the lower federal courts to consider this question in the first instance, no Supreme Court decision holds that a pre-viability Down Syndrome restriction is unconstitutional. Similarly, the Eighth Circuit has never considered the validity of a

7

Down Syndrome provision or addressed the unique issues presented by such a restriction. "None of the [Eighth Circuit's] abortion decisions holds that states are powerless to prevent abortions designed to choose the sex, race, and other attributes of children." *PPINK*, 917 F.3d at 536 (Easterbrook, J., dissenting from denial of rehearing en banc).

This absence of controlling law from the Supreme Court or the Eighth Circuit is fatal to Plaintiffs' claim, because they present no other argument against the validity of the law. As discussed in the State's prior briefing, the Down Syndrome provision satisfies strict scrutiny or any other standard of scrutiny because it is precisely tailored to advance the most compelling of state interests. Preventing an entire category of persons from being targeted for elimination solely because they possess an immutable characteristic is among the most compelling state interests imaginable. Doc. 35, at 26-28. This interest is even more compelling because of the horrifying history of medicalized discrimination and abuse experienced by persons with Down Syndrome in this country, including in quite recent decades. Doc. 35-8 (Declaration of Dr. Martin McCaffrey), ¶¶ 12-42. "It is not hyperbole to state that the history of the medical establishment's approach to Down syndrome over the last century has been dominated by discrimination." *Id.* ¶ 14. By prohibiting only those abortions performed "solely" for that purpose, the statute avoids sweeping into its coverage any abortions for other reasons, and thus it is narrowly tailored to advance this compelling state interest. Doc. 35, at 32-33; *see also PPINK*, 888 F.3d at 316 (Manion, J., concurring) ("[I]t is hard to imagine legislation more narrowly tailored to promote this [anti-discrimination] interest"). Plaintiffs have presented no argument against this analysis.

## II. The Balance of Harms and the Public Interest Favor a Stay.

The other three equitable factors also strongly favor a stay of injunction pending appeal. "When courts declare state laws unconstitutional and enjoin state officials from enforcing them,"

the "ordinary practice is to suspend those injunctions from taking effect pending appellate review." *Strange v. Searcy*, 135 S. Ct. 940, 940-41 (2015) (Thomas and Scalia, JJ., dissenting from denial of the application for a stay) (collecting cases).

As noted above, the State's interest in preventing the elimination of persons with Down Syndrome solely because they possess that immutable characteristic is compelling, urgent, and vital. *See* McCaffrey Decl., Doc. 35-8, ¶¶ 12-42. Unless stayed, this Court's injunction will permit the continuation of a practice that threatens to eliminate 61 to 93 percent of persons with Down Syndrome in Missouri, which devastates the Down Syndrome community, undermines attempts to improve the lives of existing persons with Down Syndrome, and perpetuates and reinforces the medicalized discrimination and hostility already faced by those persons. *See id.*

The State's interest in enforcing the Down Syndrome provision is supported by other compelling reasons as well. The State has a compelling interest, recognized by *Casey*, in protecting and promoting the lives of unborn children in general, which the provision unquestionably advances. In addition, abortions performed because of Down Syndrome are frequently performed at late gestational ages on pain-capable fetuses, thus inflicting horrific pain on the unborn children. Condic Decl., Doc. 35-3, ¶¶ 8-48; Condic Suppl. Dec., Doc. 48-1, ¶¶ 15-32. These abortions also subvert the traditional role of physicians as healers, by turning them into killers targeting persons for elimination solely because of an immutable characteristic. Curlin Decl., Doc. 35-5, ¶¶ 43-53. And Down Syndrome-targeted abortions contribute to the general coarsening and loss of respect for human life, including the lives of infants and born children. *See* Doc. 35, at 17-24.

Moreover, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S.

9

1301 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Calif. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).

By contrast, the irreparable injury asserted by Plaintiffs is slight or non-existent, because it depends entirely on their erroneous assertion that there is a constitutional right to terminate a fetus solely because of Down Syndrome. Because there is no constitutional right to terminate a pregnancy solely because of Down Syndrome, their argument fails. Section 188.038.2 imposes no cognizable irreparable injury because it does not violate any constitutional right. Moreover, even if there were any merit to Plaintiffs' constitutional claims, any irreparable injury could and should be addressed through a proper as-applied challenge asserted by a women seeking an abortion solely for purposes of Down Syndrome, as the Supreme Court emphasized in *Gonzales v. Carhart*, 550 U.S. 124, 167-68 (2007). "As-applied challenges are the basic building blocks of constitutional adjudication." *Id.* "The Act is open to a proper as-applied challenge in a discrete case." *Id.* (citations omitted).

## CONCLUSION

The State Defendants respectfully request that this Court stay its injunction against the enforcement of Mo. Rev. Stat. § 188.038.2 pending appeal. In addition, because this motion raises critical issues and the questions raised herein have been thoroughly and recently briefed by the parties, the State Defendants respectfully request an expedited briefing schedule on this motion, with Plaintiffs' response to this motion to be filed within three business days of this filing.

Dated: September 30, 2019  	Respectfully submitted,

**ERIC S. SCHMITT**
Attorney General

 /s/ *D. John Sauer*
D. John Sauer, #58721
  Solicitor General
Julie Marie Blake, #69643
Justin D. Smith, #63253
Emily A. Dodge, #53914
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
Fax: (573) 751-0774
E-mail: John.Sauer@ago.mo.gov

*Counsel for the State Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on September 30, 2019, the above was filed electronically through the Court's electronic filing system to be served electronically on counsel for all parties.

*/s/ D. John Sauer*

11